**CARTER–WALLACE, INC., Plaintiff,**

v.

**The GILLETTE COMPANY, Defendant.**

**Civ. A. No. 77–3186–MA.**

United States District Court,
D. Massachusetts.

May 8, 1981.

Herbert P. Kenway, Kenway & Jenney, Boston, Mass., for plaintiff.

Robert W. Furlong, Gregory A. Madera, and Frank P. Porcelli, Fish & Richardson, Boston, Mass., for defendant.

## OPINION

MAZZONE, District Judge.

### STATEMENT OF THE CASE

This is an action for patent infringement between the makers of two popular aerosol anti-perspirant products. The plaintiff, Carter-Wallace, Inc. (Carter-Wallace), is a Delaware corporation with its principal place of business in New York. Defendant, The Gillette Company (Gillette), is a Delaware corporation with its principal place of business in Massachusetts.

Carter-Wallace is the owner of United States Letters Patent No. 3,968,203, issued on July 6, 1976. The patent application was initially filed on October 1, 1965, and refiled in 1969. The patent is entitled "Aerosol Astringent Composition" and covers Carter-Wallace's aerosol anti-perspirant, "ARRID EXTRA DRY." A copy of the patent is attached to this opinion as Appendix A.

Carter-Wallace charges that Gillette has willfully infringed Claims 1, 2 and 5 of the patent by making, using and selling fifteen different aerosol anti-perspirant packages embodying the product invention set forth in the above claims. The most commonly known products charged as infringing are marketed by Gillette under the name "RIGHT GUARD" anti-perspirant. Carter-Wallace seeks damages for past infringement, an injunction against future infringement, and attorney's fees under 35 U.S.C. § 285.

Gillette denies that it has infringed the patent in suit, and claims that the patent is invalid both for lack of novelty under 35 U.S.C. § 102(a), (b), (e) or (g), and obviousness under 35 U.S.C. § 103. The defendant also claims that the patent is invalid under 35 U.S.C. § 112 because: (1) the claims are vague and indefinite and do not claim the invention in sufficiently specific terms, (2) the patent fails to disclose the best mode of practicing the invention in that it does not disclose a valve for use in the claimed invention, (3) the patent claims more than was invented by including in the claims the container and the valve as well as the composition. Finally, the defendant claims that patent is invalid or unenforceable because the applicants withheld from the Patent Office certain prior art and information as to the relevance of prior art. Gillette also seeks an award of attorney's fees under 35 U.S.C. § 285.

Briefly, then, Carter-Wallace's theory of the case is that two inventors, George Spitzer and Lloyd Osipow, invented a novel aerosol anti-perspirant composition which satisfied a long felt consumer need. The claimed invention led to the development of ARRID EXTRA DRY and eventually to the issuance of the patent in suit. Carter-Wallace claims Gillette's RIGHT GUARD and other products are nothing more than thinly disguised copies of its ARRID formulations, and defendant is therefore liable for infringement.

While Gillette asserts a number of defenses, the thrust of its case is that the Spitzer-Osipow discovery lacks the necessary features of a patentable invention, in that it simply contains ingredients known in the art performing their usual functions. At best, Gillette asserts, the inventors stumbled upon a particular ratio of these known ingredients which produced surprisingly good results. Even these results, however, Gillette claims were obvious in view of the teachings of the prior art. Finally, Gillette argues that, if the patent in

suit were valid, it would be so only because the particular ingredients and numerical limits claimed in the patent were critical. Because its challenged formulations include certain slightly different ingredients, Gillette claims it cannot be held liable for infringement.

The case was tried to the court without a jury. The record consists of the trial testimony, various depositions, and numerous other exhibits. Pursuant to Fed.R.Civ.P. 52(a), the following constitute our findings of fact and conclusions of law.

## BACKGROUND OF THE CASE

Aerosol products have become common in the United States since World War II. They are generally sold in the form of valved containers in which a product to be dispensed and a liquefied propellant[1] are held under pressure. When the valve is opened, the propellant and the product are expelled as a spray. The propellant evaporates in the atmosphere so that only the product reaches the area being sprayed. The amount of product deposited on the surface, and the spray pattern, depend upon many variables including the type of valve used, the amount and type of propellant, the nature and relative concentration of ingredients in the product, and the length of time the valve remains open. The convenience of aerosol packages has led to their use in dispensing insecticides, cosmetics, paints and, more recently, deodorants and anti-perspirants.

Perspiration odor is not unpleasant in itself, rather, the decomposition by bacteria of organic matter contained in perspiration causes malodor. This unpleasant odor can be eliminated by either reducing underarm perspiration or preventing decomposition of the organic matter. Deodorants destroy the bacteria or simply mask the unpleasant odor which it causes. Anti-perspirants, on the other hand, check both wetness and

1. The two principal types of compounds used as propellants are fluorocarbons, such as Freon, and hydrocarbons, such as butane.

malodor by actually reducing perspiration.[2] A perfume or fragrance ordinarily included in an anti-perspirant composition masks whatever odor is caused by the remaining perspiration, which is never completely eliminated.

Anti-perspirants in the form of creams and lotions first became popular during and immediately after World War II. The active ingredient, usually aluminum chlorohydrate, was present in such products in the form of an aqueous solution. In order to be effective, aluminum chlorohydrate must be dissolved in water, producing aluminum ions. However, aluminum chlorohydrate salt, when dissolved in water, produces an acidic solution which is corrosive to ordinary metals. The salt is also hygroscopic, that is, it has the tendency to absorb water from the atmosphere. As a result, initial efforts to develop an aerosol anti-perspirant were hampered by serious problems such as can corrosion and valve clogging. Clogging results when residual alcohol in the valve orifice evaporates, leaving behind aluminum salt which absorbs water from the atmosphere and recrystallizes.

In 1961, Gillette introduced RIGHT GUARD aerosol deodorant. RIGHT GUARD did not contain aluminum chlorohydrate. It prevented malodor from perspiration but did not reduce perspiration itself. RIGHT GUARD was a solution-type product like the early insecticides and contained no solid powder. It became a great commercial success, proving that the public would accept an aerosol underarm product even though a mildly unpleasant sensation was caused by the cooling effect of the spray. However, while aerosol deodorants were acceptable, they did not provide lasting protection against perspiration and body odor, and did cause irritation in the armpit, especially after shaving. Because it had long been recognized that the public preferred anti-perspirants to deodorants, the search by cosmetics manufacturers for an aerosol anti-perspirant intensified after the introduction of RIGHT GUARD aerosol deodorant. An aerosol anti-perspirant would be extremely successful, it was felt, because it combined the effectiveness of anti-perspirant creams and lotions with the ease and convenience of application of the aerosol.

To avoid the corrosion problem, researchers looked for an anhydrous, i.e., water-free liquid medium in which to dissolve the aluminum salt. Special aluminum compounds designed to be soluble in alcohol were developed. While these formulations reduced corrosion, other difficulties, such as valve clogging, prevented any product from achieving widespread consumer acceptance.

In addition to aerosol *solutions*, researchers experimented with other types of aerosol systems, in which small solid particles of aluminum chlorohydrate were suspended or dispersed in a liquid inside the aerosol package. Aerosol packages containing aluminum chlorohydrate particles suspended in a propellant and stabilized with small quantities of conventional suspending agents produced a spray of dry aluminum chlorohydrate powder. These systems effectively avoided can corrosion but experienced other problems, including settlement, valve clogging, billowing or dusting, and product inhalation. In addition, these early dry powder sprays were no more effective in stopping perspiration than aerosol deodorants.[3]

2. It is not known exactly how anti-perspirants reduce perspiration. One theory is that the astringent reacts with skin protein causing coagulation, which results in the sealing of the openings of the sweat glands. Another hypothesis is that electrolytes with a positive charge decrease or inhibit the flow of perspiration. Fortunately, resolution of this scientific question is not essential to the resolution of this case.

3. Anti-perspirant efficacy is measured by subjecting individuals to extremes of heat and humidity and determining the reduction in perspiration achieved by the test formulation. No anti-perspirant composition completely eliminates underarm perspiration under the test conditions. A rule of thumb in the industry during the early 1960's was that a product attaining less than 10 percent "sweat reduction" was not considered a true anti-perspirant. A high sweat reduction score for aluminum chlorohydrate compositions is in the range of

During this period, both Carter-Wallace and Gillette attempted, without success, to develop an effective, commercially acceptable aerosol anti-perspirant. Both believed that the breakthrough, when it came, would involve the solution technology described above. Against this background, George Spitzer, in 1964, began to take an active interest in the growing underarm products market.

Since Gillette's main defense is that the claimed invention was obvious, our analysis must begin with a review of the relevant prior art references. Our task is to determine what the prior art references would have revealed to a person of ordinary skill in the art at the time the claimed invention was made.

## PRIOR ART

We find that the relevant art encompasses both anti-perspirant chemistry and the general field of aerosol technology, and includes patents as well as commercial and scholarly research. We set out below those references which we regard as most pertinent, and note that other references were also considered, but further discussion is sacrificed to the need to limit this opinion to a reasonable length.

### DeGiacomo Article

In an article published in September, 1956 in a publication entitled. *Drug and Cosmetic Industry*, DeGiacomo described the efforts being made to apply aerosol technology as a means of dispensing finely divided powders. Some of these efforts, he indicated, involved the use of wetting agents to disperse the solid particles in a liquid medium. By contrast, DeGiacomo proposed the use of a *suspending* medium, that is, a liquid capable of suspending the powder without attacking the valve or other components of the aerosol package.

DeGiacomo concluded that a purified grade of isopropyl myristate, an oily ester

used widely throughout the cosmetics industry, had all the properties necessary to act as an ideal suspending agent for powdered products. For example, it was soluble in the conventional propellants, greaseless in character, capable of suspending powder formulations, and did not adversely affect the valve or other components. He further indicated that used in high concentrations in certain products such as liquid make-up, isopropyl myristate enhanced the functional properties of the finished product. "This higher concentration," he noted, "creates a material with a higher residual nature *allowing the solid ingredients to adhere in a given area of application.*" Defendant's Ex. 25–5, at 329 (emphasis added).

### Geary Patent

The Geary patent, No. 3,088,874, issued May 7, 1963, describes a powder aerosol system capable of dispensing a composition containing at least 15 percent by weight active powder from a conventional aerosol package. The patent states that previously, increasing the amount of active powder beyond 10 percent resulted in serious problems of valve clogging, agglomeration of powder inside the can, and dusting or billowing. Geary teaches that, if a liquid surfactant,[4] a bulking agent, a non-polar liquid, and a propellant are combined in a certain critical ratio by volume, any active powder having a diameter of at least 15 microns can be dispensed in quantities of at least 15 percent, and preferably at least 25 percent.

The organic liquid, according to Geary, can be any non-polar organic liquid which is miscible in all proportions with the surfactant and propellant, reduces the cohesive force of the active powder particles, and is an electric insulator. Examples given include propyl myristate, butyl stearate, pentyl laurate, and others. The propellant can be any conventional propellant used in aero-

35 to 40 percent. Anti-perspirant creams and roll-ons containing aluminum chlorohydrate typically score in the area of 40 percent. Most of today's aerosol anti-perspirants score in the 25 percent to 30 percent range.

4. "Surfactant" is a term of art meaning "surface active agent." Liquid surfactants are similar to the non-volatile oils discussed elsewhere in this opinion.

sol containers. The surfactant can be any nonionic, anionic, cationic, or amphylatic surfactant, including the sorbitan derivatives. The shape and size of the container and valve are not critical. The patent states that any conventional aerosol package can be used.

Geary claims that the range of active powders which can be dispensed from an aerosol system manufactured in accordance with the teaching of the invention is practically unlimited, the only limitation being the maximum particle size of the powder. A typical anti-perspirant formulation appears in the patent as Example 5, and contains 25 percent by weight aluminum chlorohydrol and 8 percent by weight non-polar oil. Finally, Geary states that the presence of conventional amounts of other ingredients, such as perfume, does not affect the powder aerosol system.

*Yakubik Article*

In July, 1964, John Yakubik published an article in *Drug and Cosmetic Industry* entitled "Formulation of Aerosols." The article describes the general function and composition of aerosol products, as well as the major types of aerosol systems, i.e., suspension, dispersion, solution, and separate-phase systems. Yakubik indicates that one of the advantages of suspension-type aerosols is their stability, that is, the ease with which chemical reactions among the ingredients can be kept to a minimum. He states:

> As a matter of fact, it is not unusual to encounter the same degree of stability in an anhydrous suspension aerosol that one expects of the active material in the dry state.

Defendant's Ex. 25–7, at 38.

Two of the greatest problems with suspension formulations discussed by Yakubik are valve clogging and leakage. He suggests two ways of dealing with these problems: (1) reducing the particle size of the active material; and (2) using a non-volatile liquid diluent, such as mineral oil or alcohol. One of the advantages of using a diluent, Yakubik claims, is that it acts as a carrier for the active ingredient. In the case of high potency material the diluent increases adherence to the skin. In addition, he states that the diluent may act as an auxiliary dispersing agent and valve lubricant.

Yakubik teaches that mineral oil, isopropyl myristate, isopropyl palmitate, alcohol, and certain other materials are all excellent diluents. Regarding the proper amount of such ingredients in the aerosol package, he states:

> The concentration of non-volatile vehicles in the total aerosol is a matter of personal preference. High concentrations of non-volatile vehicles give wetter sprays. Alcohol in 10 per cent or higher concentrations gives a cooling sensation to the spray on the skin; oils may give an oily feel on the skin especially when the powder concentration is low.

*Id.*

*Thiel Patent*

The Thiel patent, No. 2,169,095, granted February 9, 1965, claims an improvement generally applicable to self-propelling, powder-dispensing compositions consisting of a finely divided powder suspended in a liquefied propellant and a liquid, non-ionic surface active agent, i.e., an oil. Although not specifically concerned with aerosol anti-perspirant compositions, Thiel states that the active component of the formulation may be an anti-perspirant such as aluminum chlorohydrate. Briefly, the improvement consists of adding a higher alkyl halide quaternary salt, such as pyridine, to the composition.

Thiel acknowledges that one problem in the preparation of compositions consisting of a finely divided powder suspended in a liquid is the tendency of the powder to agglomerate and form deposits on the walls of the container. Thiel believed the problem was due to a mutual repulsion of individual particles. In a prior patent, No. 3,014,844, it was revealed that the agglomeration problem could be somewhat reduced by adjusting the specific gravity of the liquid components of the composition. In the improvement patent, Thiel claims that adding a higher alkyl quaternary salt in an

amount between .01 and .1 by weight further reduces the tendency toward surface caking, a problem not addressed in the prior art.

The patent states that a liquid, non-ionic surface active agent should be present in a concentration between .1 and 20 percent by weight, preferably between about .25 and 1 percent. The finely divided powder can range from .01 to 20 percent by weight, preferably between .1 and 3 percent. Thiel provides a dozen detailed examples of formulations which were represented to be suitable, with varying proportions of the active agent powder, the non-volatile liquid and the pressurized propellants. The ratio of solid powder to non-volatile oil in these examples ranges from a low of 0.7 to 1 in Example 5 (excess oil) to a high of a little over 1.5 to 1 in Example 11 (excess powder).

*Shulton Patent*

Shulton British patent No. 987,301, published March 24, 1965, describes the invention of an aerosol composition consisting of an active ingredient, a liquefied gaseous propellant, and colloidal silica in an amount sufficient to render the entire composition a substantially homogeneous gel. The stated purpose of the invention is to provide a stabilized, self-propelling aerosol composition which is of uniform and homogeneous consistency while in the container. Among the problems Shulton purports to alleviate are clogging, caking, billowing, and, in the case of anti-perspirants, can corrosion. With respect to the corrosion problem, Shulton states:

> Aqueous solutions of the well-known aluminum hydroxychloride (chlorhydrol) are of the . . . corrosive type and attack conventional metal containers producing undesirable reaction products and reducing the effectiveness of the aluminum salt. Accordingly, the application of aluminum hydroxychloride to the skin as a very finely divided powder, particularly as an aerosol, would be highly desirable since this salt will readily dissolve in perspiration and become as effective an anti-perspirant as if it had been applied to the skin as an aqueous solution.

Defendant's Ex. 25–3, at 3.

The primary teaching of Shulton, at least insofar as relates to the instant case, is that a finely divided aluminum anti-perspirant salt could be effectively dispensed as an aerosol, without significant problems of valve clogging, caking, billowing, or can corrosion. This result was obtained by combining the aluminum salt and a liquid propellant with a gelling agent, or colloidal silica, such as Cab-O-Sil, in an amount ranging between 0.1 and 10 percent by weight. The patent notes that the higher the quantity of finely divided powder, the less colloidal silica is required to produce a satisfactory result with a given liquefied propellant.

Shulton also teaches that in addition to the essential components of the powder aerosol composition, the product may contain a so-called powder lubricant, such as zinc stearate or an oily ester; a perfume in alcohol; and a skin conditioner or lubricant, such as isopropyl myristate. These components, the patent states, are included to facilitate or supplement the functioning of the active ingredient when applied to the spray surface, or to facilitate the proper functioning of the valve in the pressure tight container.

The following is an example of a typical aerosol anti-perspirant formulation prepared in accordance with the teaching of Shulton:

| Ingredient | Percent by Weight |
|---|---|
| Aluminum Hydroxychloride Powder | 6.0 |
| Colloidal Silica (Cab–O–Sil) | 2.7 |
| Isopropyl Myristate | 1.0 |
| Powder Lubricant (Brij 96) | 0.8 |
| Hexachlorophene | 0.2 |
| Perfume | 0.5 |
| Specially Denatured Alcohol | 2.8 |
| Propellant | 86.0 |

### Boyle Patent

The Boyle patent, No. 3,218,263, granted November 16, 1965, purports to solve the problems, such as valve clogging, associated with the dispensing of dry powder from an aerosol package. The key to the invention is the inclusion in the aerosol package of a silica-containing thickening agent, such as Cab-O-Sil or bentonite, in a concentration ranging from 4 to 55 percent by weight, which, when combined with a liquefied propellant, forms a homogeneous gelled composition inside the aerosol package. Boyle claims that, among the many advantages of the patented compositions is the ability to dispense a "substantially liquid-free spray." Defendant's Ex. 25–9, at col. 4. The patent expressly states that the claimed invention may be used in the preparation of aerosol anti-perspirant formulations.

### Specialties Article

An article published in December, 1964 in a publication entitled *Specialties* provides a brief but excellent summary of the state of the art with respect to aerosol anti-perspirant technology at the time. The article describes the problems of product breakdown, corrosion and valve clogging associated with the introduction of water into an aerosol package containing aluminum chlorohydrate salt. It states that the problem of clogging can be minimized by the addition of a relatively high proportion of a humectant, such as glycol, but that excessive amounts prevent the anti-perspirant from drying on the body, leaving a tacky film.

The article indicates that the problems of solubility, hydrolysis, and crystallization are not present when the aluminum chlorohydrate is utilized in the dry state. It states:

> The aluminum salt can be extended with a suitable talcum powder and the propellants, which of course are in the liquid state inside the container, act as the carrier. A valve suitable for dispensing powders must be used. Since water is excluded from the contents, no corrosion

occurs inside the containers. Plain aluminum or tinplate containers may be used. Defendant's Ex. 25–1, at 18.

The article provides the following example of an aerosol anti-perspirant powder formulation:

| Ingredient | Percent by Weight |
|---|---|
| Talc | 9.0 |
| Aluminum Chlorhydroxide Complex (Impalpable) | 1.0 |
| Isopropyl Myristate | 0.3 |
| Perfume | 0.3 |
| Propellants | 89.4 |

*Id.*

### Goldberg Patent

The Goldberg patent, No. 3,288,681 was issued on November 29, 1966, effective May 1, 1962. The patent relates to the development of an anhydrous aluminum anti-perspirant powder aerosol composition. It teaches that dispersion technology can be used to manufacture such a composition containing the following ingredients: (1) a finely divided aluminum compound, such as aluminum chlorohydrate, in an amount between 4 and 10 percent by weight; (2) an ester, such as isopropyl myristate-palmitate, in an amount ranging from 2 to 5 percent by weight, to facilitate dispersion of the powder; (3) commercial alcohol, in an amount between 2 and 4 percent by weight; and (4) a liquefied, gaseous propellant such as dichlorodifluoromethane. Other, nonessential ingredients include a non-irritating germicide and a perfume.

Goldberg claims that the patented invention makes it possible to produce an anti-perspirant aerosol powder spray. The success of the invention, the patent states, requires strict adherence to what Goldberg describes as the critical limits of the essential components and the required processing conditions. Too great an amount of aluminum powder, he states "is too dusty when sprayed and clogs the aerosol valve; and a smaller amount is relatively ineffective as an antiperspirant." Defendant's Ex. 25–4, at col. 1. Too much oil on the other hand, produces "a powder film which is too wet"

while too little "provides little observable benefit." *Id.*, at col. 2.

CALM

An aerosol anti-perspirant powder was being sold in the United States as early as 1964 by Alberto-Culver under the name "CALM." CALM contained dry powder aluminum chlorohydrate, talcum powder, an oil, a propellant, and several additives. The ratio of aluminum powder to oil in the CALM formulation was approximately one-to-one, i.e., 2.7 percent aluminum chlorohydrate versus 2.475 percent oil by weight.[5]

Tests performed by cosmetics manufacturers as well as Hilltop Research, Inc., acknowledged as the industry leader in anti-perspirant efficacy testing, revealed that CALM was no more effective in reducing perspiration than Gillette's popular RIGHT GUARD aerosol *deodorant*, achieving an average sweat reduction of 6 percent. *See* n. 3 above. While there was some contrary evidence in the form of testimony from Gus Kass, a former vice president of Alberto-Culver, that in-house "T-shirt tests" showed that CALM was effective, the more persuasive evidence indicates that CALM, as originally formulated, was ineffective as an anti-perspirant, achieved little commercial success, and was eventually removed from the market in that form.[6]

*Virzi Patent*

The Virzi patent, No. 3,472,928, issued October 14, 1965, but effective as of September 23, 1965,[7] relates to a liquid anti-perspirant composition which can be sold as an aerosol without causing undue can corrosion. "So far as is known," the patent states, "an effective amount of astringent has not yet been incorporated into a liquid cosmetic composition suitable for packaging in a metal container or can and having an acceptable shelf life." Defendant's Ex. 16–8, at col. 2.

Virzi teaches that the corrosion problem can be eliminated by dissolving the astringent in an anhydrous, volatile liquid solvent, preferably ethanol alcohol. The solvent must be sufficiently anhydrous to prevent an appreciable dissociation of the astringent salt, yet sufficiently volatile to vaporize within a short period of time after application, leaving the astringent on the skin ready to be activated by moisture in the atmosphere and on the body. The patent also describes a method of preparing the claimed invention. A typical formulation appears below:

| Ingredient | Percent by Weight (propellant excluded) |
|---|---|
| Aluminum Hydroxychloride | 5 |
| Lanolin | 2 |
| Propylene Glycol | 2 |
| Hexachlorophene | 0.4 |
| Felton Aphrosia | 0.1 |
| Ethanol | 90.5 |

*Id.*, at col. 3. In the above example, the lanolin functions as an emollient and gives soothing qualities to the composition. Propylene Glycol is used as a humectant; hexachlorophene is a bacteriostat; and felton aphrosia is a perfume. The patent states that any of the conventional propellants may be used.

The evidence in the case indicates that the "Virzi approach," i.e., an anhydrous so-

---

5. The following is a typical CALM formulation, as it was sold in 1965:

| Ingredient | Percent by Weight |
|---|---|
| Aluminum Chlorohydrate | 2.7 |
| Inert Powder (Talc) | 5.4 |
| Oil (Isopropyl Myristate) | 2.475 |
| Perfume | 0.046 |
| Hexachlorophene | 0.135 |
| Magnesium Stearate | 1.8 |
| Propellant | 87.454 |

6. Sales of CALM peaked in 1965 at approximately $3,500,000, roughly 4 percent of the underarm products market. By 1972, CALM's market share had fallen to slightly greater than 1.5 percent. Around that time, the makers of CALM introduced several products based on the Spitzer technology, which is the subject of this action.

7. Because it was characterized as a continuation-in-part of an earlier application, the Virzi patent had an effective date of September 23, 1965, some eight days prior to the filing of the original application for the patent in suit. It is included in this discussion of prior art primarily to shed light on the thinking of those skilled in the art and the aerosol anti-perspirant industry just prior to the development of the Spitzer formulation.

lution in which the aluminum salt is dissolved in a volatile liquid such as alcohol, dominated the thinking of those skilled in the art as to how to solve the aerosol anti-perspirant dilemma during the early and mid-1960's. For example, plaintiff's Ex. 85, the so-called "Prussin Art Collection," includes some 25 references in the area of anti-perspirants and aerosol anti-perspirants. To the extent they address the problem, these references unanimously teach that an alcohol or hydro-alcohol based solution was the best method of formulating an effective aerosol anti-perspirant composition.[8]

## THE TEACHINGS OF THE PRIOR ART

A person of ordinary skill in the anti-perspirant industry in the mid-1960's was aware of the efforts being made to develop an effective, commercially acceptable, aerosol anti-perspirant. He knew that most industry experts believed the key to the problem lay in solution technology generally, and anhydrous solutions in particular. However, being familiar with the literature in the field of aerosol technology, he would (or should)[9] have read and understood the references described above, and would have known that other approaches to the problem had been suggested.

One such approach involved the dispersion or suspension of finely divided aluminum chlorohydrate particles in a liquefied propellant or other suitable suspending medium. This use of aluminum powder in the "dry state" effectively eliminated the corrosion problem, but was associated with other problems, such as agglomeration or caking, valve clogging, and billowing or dusting. Perhaps most significantly, the skilled person would have known that early formulations of powder aerosols failed to achieve significant consumer acceptance, largely because they were ineffective anti-perspirants, i.e., they failed to achieve a signifi-

cant degree of sweat reduction. This ineffectiveness may have been due to the failure of the anti-perspirant composition, which was dispensed as a dry powder, to adequately adhere to the underarm in sufficient quantities to effectively inhibit perspiration.

Consulting the cited references, a person of ordinary skill would have learned that the inclusion of relatively small quantities of a suspending agent, particularly colloidal silicas such as Cab-O-Sil or bentonite, in the aerosol formulation would help disperse the aluminum chlorohydrate particles and reduce agglomeration and valve clogging. He would also have learned that the use of small amounts of oil, such as isopropyl myristate, would facilitate dispersion, lubricate the valve and prevent clogging, and impart certain desirable cosmetic properties to the skin. In greater concentrations, the oil would facilitate adherence of the anti-perspirant powder to the skin and reduce billowing, thereby making it possible to increase the concentration of aluminum chlorohydrate in the formulation.

He would have learned from Yakubik that the relative concentrations of powder and oil in aerosol compositions is largely a matter of personal preference and that, in general, the use of oil in higher concentrations would produce a wet, oily spray. He would have been aware that the use of oil in concentrations as high as 20 percent by weight had been contemplated by Thiel, and the use of isopropyl myristate in unspecified quantities as the primary suspending medium had been recommended by Yakubik. On the other hand, he would have been aware of the general feeling among industry experts that large quantities of oil in an anti-perspirant formulation would inhibit activation of the aluminum chlorohydrate, thereby reducing anti-perspirant efficacy.

8. Between 1963 and 1968 50 to 60 patents were issued covering solution-based aerosol anti-perspirants; none of the resulting products achieved any significant commercial success.

9. A person having ordinary skill in a given field is presumed to have knowledge of all the relevant prior art, even if he does not in fact have such knowledge. *Graham v. John Deere Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966).

Against this backdrop of the prior art and teachings of the prior art, we turn to the work of Spitzer and his colleague, Osipow.

## DEVELOPMENT OF THE SPITZER FORMULATION

George Spitzer graduated from St. John's University in 1935 with a degree in Pharmacy. After finishing college, Spitzer devoted his career exclusively to the development of new products. Among the products he developed were a laxative in the form of a jam, a series of dietetic health foods, and an aerosol shave cream sold in the United States by Carter-Wallace under the name "RISE." Most of the laboratory research in connection with the RISE project was performed by a research and development organization by the name of Foster D. Snell Laboratories (Snell).

In late 1964, Spitzer instructed Snell to develop an aerosol anti-perspirant. The most important property of the product he wanted was efficacy. As Spitzer indicated in his deposition:

I wanted it to be effective, that it would stop perspiration as good as any product on the market, like Arrid Cream, or Arrid Roll-On or any other antiperspirant presently being sold. So effectiveness was first.

Defendant's Ex. 21, at 7.

The person in charge of the project at Snell was Lloyd Osipow. Osipow graduated from Columbia University with a degree in chemistry in 1939. He began working for Snell in 1946, eventually becoming a Research Group Director in the areas of cosmetics, toiletries, and detergents. Osipow had been involved in the development of aerosol products since joining Snell, and had a limited role in the RISE shaving cream project. He had also worked for Spitzer on an aerosol product containing talc. Osipow was thoroughly familiar with the technical literature in the field of aerosol products and kept up to date while working on the latest Spitzer project.

As group director, Osipow supervised a number of other chemists who performed the actual experiments and analyses. Osipow described the problems encountered in the search for an acceptable formulation. These included coldness on the skin; dustiness and mistiness; failure to stick to skin; corrosion of metal containers; and clogging or malfunction of the valve. Osipow did not consider that he had solved the coldness problem, and stated that the problem of dustiness or mistiness has never been completely solved. He avoided the corrosion and clogging problems by packaging the anti-perspirant powder in an anhydrous liquid suspension, and used a colloidal silica as a suspending agent. He frequently discussed the progress of the work with Spitzer, and gave him numerous sample formulations which Spitzer tested personally.

After working on the project for about a year, Spitzer and Osipow came up with a product which they both agreed was effective and relatively problem-free. The product consisted of a composition containing less than 10 percent by weight aluminum chlorohydrate powder suspended in an essentially anhydrous solution of a hydrophobic, non-volatile oil and a conventional propellant. Provided that the amount of hydrophobic oil was at least as great as the amount of salt in the package, they found that the suspension of aluminum chlorohydrate in oil could be released through the valve and deposited on the underarm as a wet spray, where it would be activated as an anti-perspirant by moisture in the air and on the body.

Neither Spitzer nor Osipow quite understood how an aerosol anti-perspirant containing the amount of oil contemplated by their formulation could function effectively. As Spitzer testified:

Q. How did the moisture on the skin or in the air get to the aluminum chlorohydrate if it were dispersed in this anhydrous oil?

A. I don't know. It seemed to get on the skin. And the moisture seemed to do its work. It seemed to get to the aluminum chlorohydrate and make it active.

Defendant's Ex. 21, at 23. Nor could Spitzer explain what effect, if any, a change in

the amount of oil would have on the efficacy of the product:

Q. Does the moisture go through the film of non-volatile, non-hygroscopic liquid just as rapidly no matter how thick it is?

A. I can't answer that, but I can say that the amount that we finally selected, it apparently did. In other words, the ratio that we selected finally for our product of aluminum chlorohydrate and isopropyl myristate, apparently the moisture was sufficient to go through that film and cause anti-perspirant action.

*Id.* at 69.

Q. Would it work just as well if it were oily, even though the customer didn't like it?

A. I don't know that.

*Id.* at 15.[10]

Both Spitzer and Osipow acknowledged that changing the amount of oil, or varying the ratio of oil and aluminum chlorohydrate powder would affect the wetness of the spray. According to Spitzer:

The wetness of the spray is due to the amount of non-hygroscopic, non-volatile material, liquid that's in there. The oil. That's what makes it come out as a wet material, carrying the aluminum chloro-

hydrate. And we wanted enough in there so as it kept it dispersed until it was emitted, and not too much so that it came out too wet or too oily. So that was trying to find an optimum amount between the two.

*Id.* at 30. Both inventors conceded, however, that the change in wetness corresponding to a change in the amount of oil was a gradual one, and that the so-called "optimum amount" was largely a matter of personal preference. Spitzer testified:

Q. Were the relative amounts of aluminum chlorohydrate and of the non-volatile, non-hygroscopic liquid important?

A. It was to us, yes, at that time.

Q. Why?

A. Well, we didn't want the product to be overly powdery. We didn't want it to be overly oily.

Q. Why didn't you want it to be overly oily?

A. Because it would feel unpleasant on the skin.

Q. It's a matter of popularity then?

A. A matter of the consumer finding it not very desirable.

*Id.,* at 14–15.[11]

As to the required amount of aluminum chlorohydrate powder in their formulation,

---

10. Osipow's testimony on this point is also instructive:

Q. And how do you decide whether the non-volatile, non-hygroscopic liquid is in too high an amount wherein it could interfere with the anti-perspirant action?

A. Well, these days there are fairly standard tests for determining anti-perspirant efficacy that the industry recognizes or accepts.

Q. Were those tests available in 1965 when the patent application was filed?

A. I am not sure, but I think they were not available.

\* \* \* \* \* \*

Q. So in those days you might get a different result, depending upon whose test you used, is that right?

A. In those days, I suspect that that was true.

Defendant's Ex. 17, at 168–69.

11. Spitzer later elaborated on this point as follows:

Q. Is there a gradual change in the wetness as you increase the proportion of the non-vol-

atile oil with respect to the aluminum chlorohydrate?

A. Of course there is, yes. The more liquid, the wetter it is. The oilier it is, the wetter it is.

Q. Did some people prefer a spray which was drier, rather than the one that you preferred?

A. In most cases people preferred the drier over the wetter one.

Q. Did you know why that was?

A. I guess the feeling.

Q. Did it have anything to do with effectiveness?

A. I don't think so. As long as we had sufficient aluminum chlorohydrate there. The oil did not stop perspiration, it was the aluminum chlorohydrate. The astringent salt.

*Id.* at 30–31. Osipow conceded that the very characterization of a particular formulation as "wet" or "dry" was subject to dispute according to subjective preference:

Q. ... How do you determine it's a wet spray or not?

the inventors stated they wanted to include enough to provide effective anti-perspirant activity, but not so much that the product would cause excessive billowing or dusting when sprayed. Spitzer testified:

Q. If you have the non-volatile, non-hygroscopic liquid there in sufficient amount, does it make any difference how much aluminum chlorohydrate is present?

A. Yes.

Q. Why?

A. Well, it shouldn't have any more than what the patent says. It shouldn't have any more than would cause excessive dusting. Too great an amount would cause excessive dusting when sprayed against the skin in general. Generally the astringent is in an amount .2 to 10 percent.

*Id.*, at 39–40.

Q. Why did you want it not to be powdery?

A. Well, if it was powdery, again the consumer would not like it. It would be rolling off the under armpit. It would fly all over the air. It would be inhaled and breathed in the room, and I think it would make it very unpopular for the consumer.

Q. You decided that you wanted it not to be too oily and not to be too powdery just on the basis of your own experience with aerosol—with anti-perspirants?

A. I think so, yes.

*Id.*, at 15.

Neither Spitzer nor Osipow explained how the amount of aluminum powder specified in the invention and, later, in the patent was arrived at, or the effect a variation in the amount of powder either within or outside the specified limits would have on the efficacy of the composition or its rela-

tive dustiness. In fact, neither inventor could recall how the numerical limits of aluminum powder in the formulation were determined. Spitzer testified:

Q. ... do you still get dustiness if you have say 10 per cent by weight of aluminum chlorohydrate, even though you have an equal amount of non-hygroscopic liquid present?

A. I don't know if we ever did that at all. We didn't do any experiments other than those that would make a commercial product.

Q. How did you know that 10 per cent was the upper limit?

A. I guess we must have tried it out in the laboratory to see what the lower limit is and what the upper limit is.

Q. And you did find then, that if you exceeded the upper limit, you had dustiness, is that right?

A. I guess that's right, Mr. Furlong.

*Id.*, at 40–41. Osipow testified:

Q. Are you the one that came up with these numbers, these ratios?

A. I do not recall that.

Q. Do you recall whether anyone else came up with them?

A. I don't recall.

Q. Were they based on any of the work you had actually done?

A. I am sure they are based in part at least on the work that we have done.

Q. Would it be correct to say that they were educated guesses based on the work that you have done?

A. I don't know. I would have to review the work.

Q. Have you seen any thing in the work which you have been reading for the last

---

A. A wet spray is not difficult to determine in the sense that the deposit has the appearance of a liquid. If the deposit has the appearance of a powder, it's certainly not a wet spray. I can concede some borderline situations where it's somewhat difficult to determine.

Q. In the borderline cases is it a subjective judgment?

A. The word or the phrase wet spray is not an absolute in borderline cases.

Q. Do you mean by that that there can be sprays which are a little wet or more wet or less wet?

A. Yes, there can be.

Q. And judging just how wet they are then is a matter of individual subjective judgment, is that right?

A. As to when a spray is wet and when a spray is not wet, I think there are times when it's difficult for objective people to decide. Defendant's Ex. 17, at 167–68.

day or so which helps you to answer that question.

A. No, I have not.

Defendant's Ex. 17, at 164–66.[12]

This testimony of Spitzer and Osipow suggests that their discovery was not the result of inventive genius, but rather patient experimentation and trial-and-error.[13] The significance of this will be discussed in greater detail below. For the moment, we note only that those experiments resulted in a relatively problem-free aerosol formula which proved remarkably effective in reducing perspiration.

## DEVELOPMENT OF ARRID EXTRA DRY

Anthony Parisse was hired as a research chemist by Carter-Wallace in 1965 and instructed to develop an aerosol anti-perspirant. Parisse experimented with many different aerosol systems but, like most of the experts in the field at that time, was primarily interested in solution technology, i.e., aerosol compositions in which the active aluminum chlorohydrate powder was dissolved in either anhydrous alcohol or a mixture of water and alcohol.

Late in 1965, Parisse became aware of the so-called "Spitzer technology." Parisse was initially skeptical about the product, for two reasons. First, he knew that to be effective, aluminum chlorohydrate had to be dissolved in water. Parisse was concerned that the presence in the formulation of significant amounts of oil would prevent the aluminum salt from dissolving, thereby inhibiting anti-perspirant efficacy. Second, Parisse was aware that several dry powder formulations, including the CALM product discussed earlier, had proven relatively ineffective as anti-perspirants and had not achieved significant commercial success. He assumed that increasing the concentration of hydrophobic oil in what was essentially a powder formulation could only result in a less effective end product.

Nevertheless, at the direction of Carter-Wallace's management, Parisse had the Spitzer formulation tested on several occasions, and found it a remarkably effective aerosol anti-perspirant. Carter-Wallace immediately embarked on a crash program to develop a commercial product utilizing the Spitzer technology. The result was ARRID EXTRA DRY (ARRID).

ARRID was introduced into the retail market in 1967, and gained immediate consumer acceptance. Sales in 1968 were approximately $20 million, as ARRID captured approximately 10 percent of the underarm products market. By 1972, annual sales of ARRID climbed to nearly $65 million, and ARRID's market share reached approximately 16 percent.

Advertising support for ARRID during these early years was substantial. During the 5 year period from 1967 to 1972, Carter-Wallace spent nearly $50 million on advertising. This represented approximately one-fourth of the total of all advertising spent by the entire anti-perspirant/deodorant industry during that period. The evidence indicates that, while other new products have been similarly promoted in the past, ARRID was the most heavily advertised new underarm product the industry had seen in over twenty years.

**12.** The evidence indicates that Carter-Wallace, in turn, performed no tests or experiments to determine the numerical limits eventually incorporated into the patent in suit. Defendant's Ex. 2. Carter-Wallace stated that these limits "were based on theoretical calculations, literature values, etc." *Id.* In any event, no test data, from which we might ascertain how the numerical limits were arrived at, were introduced in evidence at trial.

**13.** All of the testimony referred to in this section appears in transcripts of the depositions of Spitzer and Osipow which were introduced in evidence at trial by the defendant. We recog-

nize there may be some unfairness in placing too much reliance upon these statements, in that the inventors naturally had no reason to volunteer a great deal of information at their depositions, which were taken by counsel for the defendant. On the other hand, in patent cases of this kind, evidence concerning the manner in which the claimed invention came about assists the court in ruling on a number of important issues, such as obviousness, criticality, etc. Carter-Wallace, of course, had every opportunity to introduce further testimony explaining or elaborating on the above statements, or to attempt to place them in context.

The ARRID products sold during this period were based on the Spitzer technology. While a number of different formulations were produced and sold, some 90 percent of the ARRID products sold as of June 4, 1969 contained the following formulation:

| Ingredient | Percent by Weight |
|---|---|
| Aluminum Chlorhydrate (impalpable) | 3.50 |
| Isopropyl Myristate | 6.08 |
| Bentone 34 | 0.26 |
| Perfume | 0.16 |
| Propellant | 90.00 |

Defendant's Exs. 5 and 15, at C–56.[14] The evidence indicates that ARRID was an effective anti-perspirant, achieving an average sweat reduction of 35 percent. See n. 3 above.

## PROCEEDINGS IN THE PATENT OFFICE

The initial or "parent" application for a patent on the Spitzer formulation, Serial No. 492,268, was filed October 1, 1965. On December 16, 1965, Spitzer and his financial partner, Marvin Small, sold all of their rights in the invention to Carter-Wallace, which thereafter handled the proceedings in the Patent Office. The initial application was completely rejected on the grounds of overbreadth, vagueness,[15] and obviousness.[16] In response, Carter-Wallace on June 30, 1967 submitted a series of amendments and a brief in which it attempted to distinguish the prior art references cited by the Examiner. The amended application was rejected by the Examiner on the same grounds. The Examiner also concluded that the Spitzer formulation was "fully met" by Shulton, which, he noted "discloses aerosol antiperspirant compositions which contain aluminum chlorhydroxide powder." Defendant's Ex. 15, at P–31. A subsequent amendment filed December 20, 1967, was similarly rejected as anticipated by Geary and obvious in view of Shulton.

On June 3, 1968, counsel for Carter-Wallace met with the Examiner and discussed the Shulton and Geary patents at length. On June 11, Carter-Wallace filed a petition to revive the application which was allowed. In a series of supplemental briefs, patent counsel sought to distinguish Geary as involving an aerosol powder system and Shulton as involving both a powder system and an emulsion, whereas the Spitzer formulation was described as an anhydrous liquid suspension. In response to the Examiner's request, a comparative study involving products prepared in accordance with Spitzer, Geary and Shulton was conducted and the results reported to the Examiner, together with actual samples of the respective products. The Examiner rejected the results of the comparison study and rejected Carter-Wallace's supplemental amendments on the grounds previously stated. After this rejection, the Patent Office refused to enter subsequent amendments filed June 17 and July 31, 1969.

In August, 1969, Carter-Wallace filed a new set of claims. Counsel acknowledged that the specifications of the new application, Serial No. 853,626, were identical to those of the parent application, and the new claims were directed to the same invention. The effect of the new filing, however, was that review of Carter-Wallace's previously rejected application was continued.

While the continued application was pending, the Virzi patent was approved. In

---

**14.** This differs from the original ARRID formula in several respects. Carter-Wallace changed the original formula because hexachlorophene was found to be unnecessary; less perfume was desirable; and the amount of astringent considered preferable increased slightly. None of these changes has any bearing on the issues involved in the case.

**15.** Among the terms the Examiner specifically objected to were the following: "an astringent," "an aluminum salt," "a liquid vehicle,"

"a liquefied propellant," "a non-volatile, non-hygroscopic liquid," "an agent having grease imparting properties," and "hydrophobic clays, colloidal silicas and soaps." Defendant's Ex. 15 (File Wrapper), at P–18–19.

**16.** The Examiner's initial obviousness objection was based on several references which neither party contends are controlling. We have reviewed these references and agree they are less relevant than the prior art references discussed above.

a letter filed January 5, 1970, counsel for Carter-Wallace sought to distinguish Virzi on the ground that it taught the use of volatile alcohol as the carrier for the astringent, whereas the Spitzer formulation expressly cautioned against the use of volatile carriers, teaching instead the use of non-volatile oils.

In his next action, the Examiner on September 22, 1970 rejected most of the claims of the continued application as unduly broad, and obvious over Geary.[17] Notably, however, the Examiner did not object to the claims as unpatentable over Virzi, and withdrew his previous rejection based on Shulton.

Presumably, the Examiner was persuaded that the absence of alcohol from the Spitzer formulation rendered these references—both of which taught the use of anhydrous ethyl alcohol—inapposite.[18] The examiner did, however, cite Virzi and a number of other references "to show the state of the art and to make the instant record complete." *Id.* at C–147–99. Thereafter a series of amended claims were rejected on July 23, 1971.

While the application was pending before the Examiner, applicants' corresponding application in the United Kingdom was published. The grant of a patent was opposed by several parties on the grounds that the subject matter was not new or alternatively that it was obvious, relying on numerous earlier patents and publications in support of their position.

Some of these, such as the Yakubik article discussed above, were arguably more relevant than references cited by the Examiner in the United States. In a statement acknowledging their obligation to be completely frank and candid with the Patent Office Carter-Wallace in April, 1972 submitted a list of some thirty-eight references from the British opposition which, it indicated, the Examiner may have considered to be of some relevance. Several months later, Carter-Wallace followed up the earlier list by submitting copies of the references in two bound volumes. At the time, it stated:

> With regard to these additional references, it should be noted that these foregoing references are, at best, merely cumulative. None of these references is believed to be any more pertinent than the references now of record and such references certainly do not disclose or suggest applicants' claimed invention.

Defendant's Ex. 15, at C–234.

The continued application was finally rejected on January 18, 1973. In rejecting a further amendment filed after that date, the Examiner stated that the evidence relied upon by Carter-Wallace to distinguish Geary showed nothing more than a difference *in degree* as opposed to a difference *in kind* between the Geary composition and the Spitzer composition. *Id.* at C–308–09. On June 18, 1973, Carter-Wallace filed a notice of appeal from the final rejection of its application.

After a hearing on February 4, 1976, a three member Board of Appeals on March

---

**17.** With respect to Geary, the Examiner stated:

Geary et al disclose an antiperspirant composition which contains a non-polar, organic liquid having a specific gravity of 1.6, a propellant, an antiperspirant astringent and a grease imparting agent. See Example 5 and Table II. Applicant's [sic] have argued that the Geary et al composition fails to suggest the instant composition because the Geary et al composition must contain at least 15% by weight of astringent. The foregoing argument has been given careful consideration but it is not considered persuasive. The Parisse affidavit [containing the results of the comparison study], has been given careful consideration but is not considered effective.

The affidavit is not effective because it is addressed to following the teachings of the Geary et al patent *rather than establishing the criticality of use of 10% astringent salt as opposed to using 15% astringent salt.* Further, it is noted that Y in the Parisse affidavit can be 10 therefore the instant composition and the Geary et al composition can be the same.

Defendant's Ex. 15, at C–147 (emphasis added).

**18.** In this same action the Examiner for the first time cited the Goldberg patent, which also included anhydrous ethyl alcohol in its formulations, but he did not rely on it to reject the claims, possibly for the same reason.

11, 1976 reversed the decision of the Examiner. The Board considered only Claims 1, 2, 3, 5 and 8 of the application,[19] and stated the sole issue on appeal as the propriety of the Examiner's rejection of the claims over Geary.

The Board was persuaded by Carter-Wallace's argument that the Spitzer formulation was not obvious over Geary, because the latter was a powder aerosol while the former was a liquid suspension. In addition, the Board noted that the numerical limits and ratios of ingredients in Geary were described as "critical" to that composition, and those limits and ratios were different from the ones taught by Spitzer.

The Board disagreed with what it regarded as the Examiner's implied conclusion that, since the same ingredients were present in both the Geary and Spitzer formulations, the same result would necessarily obtain when one combined those ingredients in different proportions, stating:

The basic weakness in the Examiner's position quite clearly is that although the same components are present in the system of Geary et al as are in the claimed system they are, nevertheless, not present in the same proportions.

\* \* \* \* \* \*

Quite clearly, therefore, it cannot be said that the proportions of ingredients taught as critical by Geary et al to obtain a powder aerosol system make it *prima facie* obvious to use the claimed amounts of components and which when expelled from the aerosol bomb are effective in the form of a liquid suspension of the astringent powder; this is clearly a composition and result not suggested by the reference disclosure.

*Id.* at C–414–15. However, the Board said nothing about the Examiner's finding that the Spitzer formulation itself lacked criticality, i.e., that it produced a result different only in degree from the prior art.

Finally, the Board was influenced by evidence of secondary considerations presented by Carter-Wallace in reaching the conclu-

sion that the invention was not obvious, noting that:

[T]he claimed package, an embodiment thereof being sold under the proprietary trade name of "Arrid Extra Dry" by appellants' assignee (Carter-Wallace, Inc.), has achieved extreme success in the anti-perspirant market giving rise to the manufacture and sale of many competing products of similar composition. Such can clearly be viewed as indicia of non-obviousness, the invention also satisfying a long-felt need and solving problems as to which many attempts had earlier been made.

*Id.* at C–415 (citations omitted).

Following a remand for consideration of certain patents referred to for the first time on appeal, the Patent Office issued a Notice of Allowance of the application on April 28, 1976.

## THE PATENT IN SUIT

The patent in suit, United States Patent No. 3,968,203, as finally issued July 6, 1976, attached as Appendix A, relates to a novel astringent and anti-perspirant aerosol system, capable of dispensing a liquid spray of astringent from a conventional aerosol bomb. Prior to the invention, the patent states that there had not been a truly commercially acceptable aerosol anti-perspirant composition that could be packaged in a conventional metal aerosol container.

The description points out that previously, anti-perspirants were effective in aqueous solution, but that aqueous solutions in metal aerosol containers caused a corrosion problem, and that crystallization of the solution in the valve orifice caused valve malfunction. It acknowledges prior aerosol packages containing the astringent in powder form, but asserts that they were unsatisfactory because they produced clouds of dust breathed by the user.

The stated objects of the patent are to provide an improved anti-perspirant aerosol formulation which: (1) causes minimum internal container difficulties and improved

---

**19.** These claims correspond to Claims 1–5 of

the patent in suit as finally approved.

results with respect to corrosion and valve malfunction; (2) is applied to the skin as a wet spray in the form of a liquid suspension of astringent material, the astringent material being activated by the moisture of the air and the body; (3) imparts a feeling of lubrication and reduces the likelihood of inhalation problems; and (4) minimizes valve clogging and leakage.

The patent asserts that the above objectives can be realized by formulating an aerosol anti-perspirant composition consisting of an astringent material in fine powder form suspended in a liquid vehicle which is essentially anhydrous, the liquid vehicle containing as essential ingredients a liquefied propellant and a non-volatile, non-hygroscopic liquid. The patent specifically teaches that the use of a volatile component, such as alcohol, instead of a non-volatile component will not give suitable results. However, nothing in the patent expressly prohibits the inclusion of a small amount of alcohol not affecting the overall function and properties of the composition.

The active anti-perspirant agent described in the patent is not limited to aluminum chlorohydrate but includes other salts of various metals said to be useful as astringents in powder form. However, the claims are restricted to aluminum chlorohydrate. The patent describes in scientific terms the non-volatile, non-hygroscopic liquid suitable for use in the composition,[20] including

among the examples organic esters such as *isopropyl myristate*. Any conventional propellant meeting certain general criteria [21] specified in the patent can be used.

Both the specifications and claims set forth the numerical limits of the essential ingredients and the reasons for those limits. These may be summarized as follows:

(1) The astringent should be in an amount sufficient to impart the desired anti-perspirant activity when activated by the moisture in the air but should not be in too great an amount to cause excessive dusting when sprayed against the skin. In general, the astringent is in an amount from .2 to 10% and preferably .5 to 5% by weight of the total composition, and in an amount from .01 to 1.0 part by weight and preferably .05 to .3 part per part of the non-volatile, non-hygroscopic liquid.

(2) The non-volatile, non-hygroscopic liquid should be in an amount sufficient whereby the astringent is deposited on the skin in the form of a wet spray but should not be in too high an amount wherein it would interfere with the anti-perspirant action of the astringent as well as causing the wet spray deposited on the skin to be of too oily a nature. In general, the non-volatile non-hygroscopic liquid is

---

20. Specifically, the patent states:

 Suitable non-volatile, non-hygroscopic liquids for use in combining with the liquified propellant in providing the desired liquid vehicle are essentially non-polar organic liquids having: (a) a vapor pressure less than about 25 mm of mercury at 70°F; (b) a boiling point at atmospheric pressure not lower than 250°F; (c) a dielectric constant not greater than 10, and preferably less than 5; (d) a specific gravity between 0.7 and 1.6 and preferably between 0.7 and 1.2; and (e) a water solubility such that it will not dissolve more than about 5% of water at 70°F. Examples of such materials are hydrophilic oils such as hydrocarbon oils exemplified by tetradecane, organic esters such as isopropyl myristate and glyceryl trioleate; alcohols such as lauryl alcohol; carboxylic acids such as oleic acid; and, silicone oils such as the dimethylpolysiloxanes.
 Appendix A, at col. 3.

21. The propellant is described more fully in the patent as follows:

 A liquified propellant which is gaseous at room temperature and atmospheric pressure and non-reactive with other components present in said package.
 Appendix A, at col. 6.
 Generally, the vapor pressure is in the range of 15 to 75 p.s.i.g. at 70°F, and preferably 20 to 50 p.s.i.g. Examples of materials that may be used as a propellant component, either alone or in admixture, are trichlorofluoromethane (Freon 11), dichlorodifluoromethane (Freon 12), tetrafluorodichloroethane (Freon 114), hexafluorodichlorobutane (Freon C 316), octafluoropropane (Freon 218), cyclic octafluorbutane (Freon C 318), propane, butane, pentane and isobutane.
 *Id.* at col. 4.

in an amount from 2 to 50% by weight of the total composition, preferably 5 to 25% by weight.

(3) The propellant should be in an amount to provide the desired vapor pressure for dispensing the desired contents from the container without causing excessive dusting when the wet spray containing the dispensed astringent is applied against the skin. In general, the propellant is in an amount from 50 to 98% by weight of the total composition, preferably 75 to 95% weight.

Appendix A, at col. 4 and Claims 1 and 2.

The patent next states that "it has been found desirable" to incorporate in the aerosol composition of the invention materials having "grease imparting properties" in order to act as thickening or gelling agents for the non-volatile liquid and aid in preventing valve malfunction. *Id.* at col. 4. The expression "grease imparting agent" as used in the patent is merely the inventors' lexicon for a suspending agent.

Examples of such materials recited in the patent include hydrophobic clays such as bentonite, colloidal silicas such as Cab-O-Sil, and grease forming soaps such as aluminum stearate. As used in the patent in suit, "bentonite" is a generic term which, to a person skilled in the art would include modified forms such as Bentone 34. The patent states that, in general, these agents should be present in an amount "up to 1% by weight of the total composition and prefer-

ably 0.05 to 2% by weight." *Id.* at col. 4–5 and Claim 5.

The patent indicates that small amounts of certain other ingredients, such as perfume and a bacteriostat, may be included in the composition if desired. Finally, the patent provides six "working examples" of compositions intended to illustrate the claimed invention.[22] *See* Appendix A, at col. 5.

### THE DEVELOPMENT OF RIGHT GUARD

Prior to the introduction of ARRID, Gillette was also working feverishly to develop a commercially viable aerosol anti-perspirant. It also subscribed to the view that solution technology would produce favorable results, and directed its research efforts toward reducing or eliminating the problems, such as can corrosion and valve clogging, which until that time, had prevented the development of a successful solution-based product.[23]

During this period Reheis Chemical Company, a leading producer of anti-perspirant chemicals, spent approximately $1 million developing and promoting an alcohol-soluble aluminum salt which it sold under the tradename "Rehydrol." The evidence indicates that Reheis received a preliminary order for Rehydrol from Gillette early in 1963, but that Gillette later cancelled the order.

Early in 1967, Gillette obtained and tested samples of ARRID used in a test market

---

**22.** The claims of the patent in suit also refer to a container and valve as well as the composition itself, but do not describe the mechanical features of the valve or the construction of the container or valve. This is because the object of the inventors was to develop an effective aerosol anti-perspirant composition which could be marketed successfully in a conventional aerosol container. However, because the formulations described and claimed in the patent in suit cannot exist outside a pressurized container and have no utility unless the container is equipped with a valve, the Examiner required that these items be included in Claim 1 during the prosecution of the patent application.

No question about the need to describe or define the container or valve was ever raised

by the Examiner. It was well within the capacity of persons skilled in the industry to select an appropriate container and valve for use with the claimed composition. Indeed, the inventors stated that different manufacturers might well select different valves in order to achieve different spray patterns, delivery rates, etc.

**23.** The defendant's witness, William Gale, former director of research and development for Gillette's Toiletries Division, testified that the reason Gillette avoided suspension-type aerosols during this period was because Gillette's market research personnel concluded the public would not buy an aerosol anti-perspirant which had to be shaken prior to use.

offering. Its analysis of the product left Gillette skeptical about the product's efficacy, as reflected in the following excerpt from a "Competitive Products Review" prepared for management in March, 1967:

The antiperspirant effectiveness has not been determined, but the amount of aluminum salt found in the product should contribute some anti-perspirant action, unless their emollient and/or emulsifier system is interfering with activity as sometimes happens.

Plaintiff's Ex. 48.

By the spring of 1968, the commercial success of ARRID was widely known, and top management at Gillette directed the Toiletries Division to develop a competitive product utilizing suspension technology. A number of formulations were prepared, some of which were acknowledged by Gillette to be "virtually identical (except for fragrance)" to the ARRID formulation. Plaintiff's Ex. 59. In its haste to get a competitive product on the market, Gillette avoided extensive product testing. As a result, the first RIGHT GUARD anti-perspirant formulations were available by August of 1968.

RIGHT GUARD anti-perspirant was quickly accepted by the public. In 1969, sales of RIGHT GUARD were approximately $20 million. By 1972, annual sales were nearly $38 million, and RIGHT GUARD captured approximately 8 percent of the underarm products market. In 1969, Gillette also introduced "SOFT'N DRI," a product similar to both ARRID and RIGHT GUARD designed especially for women.[24] Between 1969 and 1972, SOFT'N DRI achieved annual sales of approximately $26 million and captured a 6 percent share of the market. Together, Gillette's two suspension-type aerosol anti-perspirants enjoyed an aggregate market-share of approximately 14.6 percent in 1972. In the meantime, sales of RIGHT GUARD deodorant dropped from a high point of 25.6 percent market share to an 11.4 percent share in 1972.

The Gillette formulations alleged to infringe the patent in suit are set forth as numbers 1, 4–8, 11, 12, 14–17, 19, 20 and 21 in Plaintiff's Ex. 98A. The evidence indicates that these formulations are strikingly similar to those sold by Carter-Wallace, and the examples provided in the patent in suit. All of the accused Gillette formulations contain aluminum chlorohydrate astringent in fine powder form. The astringent is in an inactive state when dry but is corrosive to the metal of containers and has anti-perspirant properties only when dissolved in water. Each of the formulas includes an essentially anhydrous liquid vehicle in which the astringent powder is suspended and dispersed. The vehicle in each of the compositions consists essentially of a liquefied propellant which is gaseous at room temperature and atmospheric pressure and non-reactive with the other components in the container, and a non-volatile, non-hygroscopic, non-polar organic liquid which meets the technical specifications of the liquid claimed in the patent in suit, see n. 20 above. In each of the accused products, the astringent powder and non-volatile, non-hygroscopic liquid are dispensed together from the container in the form of a liquid suspension upon the opening of the valve so as to be applied to the skin in the form of a wet spray. In each of the accused products the astringent is present in amounts from 0.2 to 10 percent by weight of the total composition, the non-volatile, non-hygroscopic liquid is present in an amount from 2 to 50 percent by weight of the total composition, and a propellant is present in an amount from 50 to 98 percent by weight of the total composition. In each of the accused products there is at least as much non-volatile, non-hygroscopic liquid as there is astringent.

---

**24.** The evidence indicates SOFT'N DRI was virtually identical to RIGHT GUARD except for the fragrance and the absence of alcohol. Gillette believed that, by eliminating alcohol, the product would be more attractive to women because it would not sting when applied to the underarm after shaving. Several SOFT'N DRI formulations are among those challenged by Carter-Wallace.

The Gillette formulations numbered 1, 4–8, and 11 in Plaintiff's Ex. 98A contain aluminum chlorohydrate astringent in an amount from 0.5 to 5 percent by weight of the total composition and non-volatile, non-hygroscopic liquid in an amount from 5 to 25 percent by weight. Gillette's products numbered 1, 2, 4–8, 11, 12, 14–17, 19, 20 and 21 set forth in Plaintiff's Ex. 98A each contain either bentonite or silica.

In the mid-1970's the Federal government promulgated regulations banning the use of fluorocarbon propellants in certain aerosol packages. Gillette, along with others in the industry, altered its anti-perspirant compositions by replacing the fluorocarbon propellants with hydrocarbons. The patent in suit, as exemplified by example 3 in column 5, lines 32–38, specifically indicates that such hydrocarbon propellants can be used with the claimed invention. Since the density of hydrocarbon propellants is significantly less than the fluorocarbon propellants, the volume of propellant in the can is increased. In order to maintain adequate dispersion of the materials, Gillette added small amounts of anhydrous ethyl alcohol to its products in order to enhance the dispersing effect of the suspending agent, Bentone 34. The addition of a small amount of alcohol to open up the Bentone was a recommendation of the Bentone supplier. The small amount of alcohol in the package does not replace the non-hygroscopic, non-volatile vehicle, and its presence in the products does not induce valve malfunction or corrosion and does not adversely affect the efficacy of the product. The aluminum salt does not dissolve in the small amount of alcohol present. Users are incapable of discerning whether a given product contains a small amount of ethyl alcohol because the amount is so small.

In sum, the above discussion, as well as the entire history of the development of RIGHT GUARD contained in the record, compels us to conclude that the accused products employ the same means, utilize the same mode of operation, and obtain the same result as the compositions disclosed and claimed in the patent in suit.

## MISCELLANEOUS FINDINGS

Following the initial commercial success of ARRID, a number of manufacturers in addition to Gillette switched to the Spitzer technology and developed suspension-type aerosol anti-perspirants. During the period 1967–72, 90 percent or more of all the aerosol anti-perspirant spray packages sold were in the form of an anhydrous suspension of aluminum chlorohydrate in a non-volatile, non-hygroscopic vehicle which was expelled as a wet spray.

The success of these new products is documented in the market data of A.C. Neilsen and similar market surveys relied upon by the industry. The Nielsen data show that aerosol *deodorants* reached their zenith in 1967 with a 57 percent share of the underarm products market. In 1968, after the introduction of ARRID, aerosol deodorants fell to a 49.09 percent share. The trend continued and by 1972 aerosol anti-perspirants enjoyed a 55.5 percent market share while deodorants had fallen to a 24.2 percent share. The evidence indicates that advertising expenditures played a role in advancing the development of this product concept, but that advertising alone could not have sustained such widespread and sustained consumer acceptance unless the product filled an existing consumer need and the aerosol anti-perspirant obviously filled many consumer needs.

Both ARRID and RIGHT GUARD were relatively effective aerosol anti-perspirants. In standardized efficacy tests, both products achieved an average sweat-reduction of 35 percent. *See* n. 3 above.

In 1972–73, Carter-Wallace introduced a second line of powder aerosol anti-perspirant packages which contained relatively small amounts of oil, i.e., an oil to powder ratio much less than 1 to 1. These were similar to the CALM formulation, which was unsuccessful largely because it was ineffective as an anti-perspirant. However, the ARRID powder formulation was very successful. This fact tends to support the view that the success of particular aerosol anti-perspirants during this period was due

in part to their efficacy and satisfaction of consumer needs, and in part to the consumers' perception of quality, cultivated at least in part by extensive promotion and advertising.

In September, 1974, Gillette obtained two improvement patents based on the Spitzer technology. These patents are essentially copies of the patent in suit, but contain additional claims covering materials said to have anti-staining properties.

## CONCLUSIONS OF LAW [25]

The major issues in this case are the validity of the patent in suit and whether it was infringed. Before addressing those issues, several preliminary conclusions are appropriate.

### Preliminary Conclusions

This Court has jurisdiction over the parties and the subject matter. 28 U.S.C. §§ 1338(a), 2201, 2202. Venue is proper under 28 U.S.C. § 1400(b).

Carter-Wallace, as the assignee of Spitzer and Small, is the owner of the patent in suit. Accordingly, if the patent is held valid and infringed, Carter-Wallace is entitled to appropriate relief.

■ The invention date, also the effective date of the patent in suit, is October 1, 1965, the date on which the original or parent application for the patent was filed. *Helene Curtis Industries, Inc. v. Sales Affiliates, Inc.*, 233 F.2d 148, 155–56 (2d Cir.), *cert. denied*, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956). Accordingly, in considering the issue of obviousness, the prior art must be viewed from the point in time just prior to that date. 35 U.S.C. § 103; *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 412 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

■ The patent in suit relates to a combination of known ingredients. Hence, we must scrutinize the claims "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976) (citing *Atlantic & Pacific Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), *reh. denied*, 340 U.S. 918, 71 S.Ct. 349, 95 L.Ed. 663 (1951)).

■ Ordinarily, a patent once granted is presumed valid. 35 U.S.C. § 282. In the case of a combination patent, however, the presumption is not a heavy one to begin with. *Futorian Mfg. Corp. v. Dual Mfg. & Engineering*, 528 F.2d 941, 943 (1st Cir. 1976) (citing *Lawrence Rigging, Inc. v. Airtek Corp.*, 182 U.S.P.Q. 375 (D.Mass.1974)). The presumption is further weakened to the extent it appears that the Patent Office, for whatever reason, did not consider pertinent prior art in approving the application. *Spound v. Mohasco Industries*, 534 F.2d 404, 409 (1st Cir.), *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167, *reh. denied*, 429 U.S. 988, 97 S.Ct. 513, 50 L.Ed.2d 601 (1976); *Forbro Design Corp. v. Raytheon Co.*, 532 F.2d 758, 761–62 (1st Cir. 1976); *Futorian Mfg. Corp.*, 528 F.2d at 943.

■ In this case, the presumption of validity is entitled to little, if any, weight. The patent Examiner did not consider all of the relevant prior art references discussed above. Those references he did consider persuaded the Examiner to reject the claimed invention on the grounds, among others, of obviousness and lack of criticality. As we have indicated, the Board of Appeals, in reversing the Examiner, viewed the patent in suit in light of just a single reference, Geary, which we do not regard as the most pertinent prior art reference. While plaintiff's failure to call the Examin-

---

**25.** Mindful that many issues in patent litigation involve mixed questions of fact and law, *see* e.g., *International Telephone and Telegraph Corporation v. Raychem Corporation*, 538 F.2d 453, 456 (1st Cir.), *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976) (obviousness, although within limits a question of law is essentially one of fact), it may be difficult to draw a sharp distinction in this Opinion between factual findings and legal conclusions. To the extent the following discussion incorporates factual material, it should be regarded as a continuation of the findings set forth above.

er's or the Board's attention to these other references may not rise to the level of fraud, it justifies our refusal to regard the presumption of validity as significant in this case. *Ceco Corp. v. Bliss & Laughlin Industries, Inc.*, 557 F.2d 687, 691 (9th Cir. 1977) (presumption overcome where relevant prior art was seemingly unknown to and not cited by examiner).

### Validity

Gillette challenges the validity of the patent in suit on a number of different grounds. Several of these do not require lengthy analysis.

#### 1. Overclaiming

■ Gillette argues that the patent in suit is invalid because, by including in the claims a container and valve as well as the composition itself, the applicants claimed more than they invented. However, as the record clearly indicates, the composition serves no useful function and, indeed, cannot exist outside a valved container. The very references complained of by the defendant were inserted in the claims in order to satisfy the Examiner. Under these circumstances, we are satisfied the applicants claimed no more than they believed they invented. If the claimed composition satisfies the other requirements of patentability, i.e., usefulness, novelty, nonobviousness, etc., the patent will not be held invalid on this ground. *See Rosen v. Lawson-Hemphill, Inc.*, 549 F.2d 205, 209 n. 2 (1st Cir. 1976).

#### 2. Vagueness

■ Defendant next argues that the claims of the patent in suit are vague and indefinite and fail to satisfy the requirements of 35 U.S.C. § 112 that the patent particularly point out and distinctly claim its subject matter. We conclude that the patent contains a sufficiently clear written description of the claimed aerosol anti-perspirant composition to enable any person skilled in the art to practice the invention. The evidence shows that a person skilled in the art would understand what is meant by "a liquefied propellant which is gaseous at room temperature and atmospheric pressure" and would realize that the use of conventional propellant blends disclosed in the specification were intended. The evidence also shows that the term "bentonite" used in Claim 5 was intended to include and would be interpreted by a person skilled in the art to include commercially available, chemically modified bentonites such as the Bentone 34 described in the specification.

In addition, the patent adequately describes the limits of the claimed invention, "so that it may be known which features may be safely used or manufactured without a license and which may not." *General Electric Co. v. Wabash Co.*, 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402 (1937) (citing *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163 (1931)). This is all section 112 requires. Gillette's vagueness defense is rejected.

#### 3. Best Mode

■ 35 U.S.C. § 112 also requires that a patent set forth the best mode contemplated by the inventor of carrying out his invention. Gillette claims that plaintiff's failure to describe the valve construction or design, or disclose the specific valve found by the inventors to be the best one for use with the claimed invention violates this statutory requirement and renders the patent invalid. However, as indicated above, the use of a particular valve was never contemplated as part of the invention. Rather, selection of a valve was regarded by the inventors as a matter of subjective judgment. Since the ability to select a suitable valve was well within the skill of the art at the time the invention was made, the requirement that applicants disclose the best way contemplated by them of practicing their invention did not require that they specify in the patent the construction or design of the valve they recommended to Carter-Wallace. *See International Telephone & Telegraph Corp. v. Raychem Corp.*, 538 F.2d 453, 460 (1st Cir.), *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976) (applicant not required to disclose chemical

formula of an ingredient well known in the trade which had been included in the patent but was not part of the claimed invention). *Compare Dale Electronics, Inc. v. R. C. L. Electronics, Inc.*, 488 F.2d 382, 388–89 (1st Cir. 1973) (where applicant sought to bring all types of insulating materials within the scope of its patent claim, failure to disclose a particular material found to have worked effectively violated best mode requirement of section 112).

### 4. Unclean Hands

■ Gillette claims the patent should be declared invalid or, if valid, unenforceable, because it was obtained as a result of inequitable conduct on the part of the plaintiff. Since, with the single exception of the *Specialties* article, all of the pertinent prior art references were at one time or another cited in plaintiff's filings, Gillette cannot rely on failure to disclose pertinent prior art as the basis of its defense. Rather, Gillette's "unclean hands" defense amounts to nothing more than a claim that the applicants failed to exercise a high degree of candor during the prosecution of the patent in suit by failing to explain to the Patent Office the *relevance* of certain prior art references. *See*, e.g., Gillette's Brief After Trial, at 38–39 (filed March 20, 1981).[26]

The First Circuit has not defined the exact standard of conduct necessary to render an otherwise valid patent unenforceable; but it has suggested that some element of wrongful conduct is required. *International Telephone & Telegraph Corp.*, 538 F.2d at 461. We find no hint of any wrongful conduct on the part of Carter-Wallace in this case. At most, the record reflects plaintiff mistakenly believed certain prior art references were either irrelevant or cumulative, and, as a result, did not highlight them for the Examiner or the Board. However, the record discloses that all of the plaintiff's actions with respect to the disclosure of prior art reflect nothing but honesty, candor, and the utmost good faith. Gillette's unclean hands defense is accordingly rejected.

### 5. Anticipation

■ 35 U.S.C. § 102(b) provides that a person shall not be entitled to a patent if the claimed invention was patented or described in a printed publication in this or a foreign country, or was in public use or on sale in this country, more than a year prior to the date of the application for the United States patent. To "anticipate" under section 102, a prior art reference must disclose all the elements of the claimed invention or their equivalents functioning in essentially the same way. *Shanklin Corp. v. Springfield Photo Mount Co.*, 521 F.2d 609, 616 (1st Cir. 1975), *cert. denied*, 429 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *Columbia Broadcasting System v. Sylvania Electric Products, Inc.*, 415 F.2d 719, 725 (1st Cir. 1969), *cert. denied*, 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970).

■ In this case Gillette asserts the defense of anticipation, relying on Thiel, Yakubik, and DeGiacomo. *See* Gillette's Brief After Trial, at 18–20. However, none of these references, by itself, discloses within its four corners adequate direction for the practice of the claims Gillette seeks to invalidate. Since the defense of obviousness is less strict than anticipation, *Shanklin Corp.*, 521 F.2d at 617, we believe the prior art references cited by the defendant are more properly considered in connection with

---

26. Gillette also claims that plaintiff's deliberate failure to call the attention of the Examiner or the Board of Appeals to the decision of the British Patent Office amounts to fraud. We disagree. Plaintiff's patent counsel could justifiably have concluded that the British decision need not have been submitted because it was irrelevant. *See Application of Larsen*, 292 F.2d 531, 533, 49 CCPA 711 (1961), *cert. denied*, 370 U.S. 936, 82 S.Ct. 1580, 8 L.Ed.2d 806 (1962) (in view of differences between foreign patent laws and those of the United States, allowance of claims in foreign countries is not pertinent to question whether similar claims should be allowed here). *Compare General Instrument Corporation v. Hughes Aircraft Co.*, 399 F.2d 373, 381 (1st Cir. 1968) (court in *dictum* acknowledged relevancy of foreign filings). Right or wrong, plaintiff's failure to call attention to the British decision hardly rises to the level of fraud necessary to invalidate an otherwise valid patent.

our ruling on that defense.[27] Gillette's defense of anticipation is accordingly rejected.

### 6. Obviousness/Criticality

35 U.S.C. § 103 provides that an invention is not patentable if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. The Supreme Court has stated that the question of obviousness, *vel non,* is to be determined against the background of several basic factual inquiries:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

*Graham v. John Deere & Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). In *Graham* and a subsequent case, *Anderson's-Black Rock v. Pavement Company,* 396 U.S. 57, 62, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969), the Court admonished that "strict observance" of the above analysis is required. *Accord Metaframe Corporation v. Biozonics Corporation,* 352 F.Supp. 1006, 1010 (D.Mass.1972).

■ The inquiry into obviousness, as virtually every other aspect of patentability, is designed to promote the fundamental policy underlying the patent system, which is to insure that the social benefits of a claimed invention outweigh the restrictive effects of the grant of a patent monopoly. *Graham,* 383 U.S. at 11, 86 S.Ct. at 690. Specifically, it is designed to help distinguish true "inventions" requiring more ingenuity and skill than that possessed by a person of ordinary skill in the art, and thereby deserving of patent protection, from mere routine advances in the art,

which are not. *Id.; Metaframe Corp., supra.*

■ Applying the three-pronged *Graham* test to the facts of this case, we conclude first that the scope of the relevant prior art included *both* the specific fields of anti-perspirant chemistry as well as the more general field of aerosol packaging. *See Mandel Brothers, Inc. v. Wallace,* 335 U.S. 291, 296, 69 S.Ct. 73, 75, 93 L.Ed. 12 (1948) (citing *Dow Chemical Co. v. Halliburton Oil Well Cementing Co.,* 324 U.S. 320, 327, 65 S.Ct. 647, 650, 89 L.Ed. 973 (1944)); *Metaframe Corp.,* 352 F.Supp. at 1011–14 (pertinent art is the functional, conceptual, or generic art, not the knowledge of artisans in separate areas in which diverse products are sold).

In this instance, a broad view of the scope of the relevant prior art is justified, not only by the general policies expressed in the above cited cases, but also by our own conclusion regarding the *third* prong of the *Graham* test, namely, the level of skill in the art at the time the claimed invention was made. Briefly, persons of ordinary skill seeking to develop a commercially acceptable aerosol anti-perspirant in the early and mid-1960's, including both Spitzer and Osipow, had a degree in science with a knowledge of aerosol packaging and of aerosol valves. They were familiar with publications and patents relating to aerosol packaging and propellants in general and had some practical experience in the formulation of cosmetic compositions and their packaging in aerosol containers. They were familiar with and understood the prior art references discussed above.

■ The *content* of the prior art has been discussed at length above and need not be restated here. In short, the prior art taught that problems of can corrosion and valve clogging could be avoided by suspend-

---

27. In its Post-Trial Brief, Gillette subsumed its arguments as to both anticipation and novelty within its argument on obviousness. Gillette's Brief After Trial, at 4–21. Since we regard obviousness and criticality as the central issues in this case, we make no separate ruling but assume, without deciding, that the patent in

suit satisfies the novelty requirement of 35 U.S.C. § 102. *See United States v. Adams,* 383 U.S. 39, 50–51, 86 S.Ct. 708, 713–714, 15 L.Ed.2d 572 (1966) (fact that invention demonstrated certain operating advantages over prior art was sufficient to support a finding of novelty with respect to combination patent).

ing fine particles of the active ingredient in a liquid medium. Several publications recommended the use of oils, such as isopropyl myristate, as the primary suspending medium. Used in larger quantities, it had been observed that such oils facilitated adherence of the active ingredient to the skin.

In addition, several efforts had been made to develop a dry-powder aerosol anti-perspirant utilizing suspension technology. Most of the formulations included a small quantity of oil to facilitate particle dispersion and serve as a valve lubricant. None of those efforts resulted in a truly commercially successful product, however, largely because the dry powder formulations were generally regarded as ineffective anti-perspirants.

Turning to the claimed invention, we note first that neither Spitzer, Osipow, nor Carter-Wallace invented or discovered any of the ingredients listed in the patent or used in the ARRID formulations which plaintiff claims Gillette copied. Nor were they the first to combine those ingredients in an aerosol anti-perspirant composition. Indeed, any such claim would necessarily fail in view of Shulton, Geary, and the other prior art references discussed above, many of which utilized some or all of these ingredients.

Rather, stripped to its essence, the "invention" upon which plaintiff relies to sustain the validity of the patent is Spitzer's discovery that a combination of known ingredients having known properties, in certain critical amounts and proportions, would result in an aerosol anti-perspirant product having unexpected and desirable properties not previously discussed or achieved in the art.

Plaintiff has acknowledged this point in each of the many briefs and memoranda submitted during the course of this litigation. For example, in its original Trial Brief, Carter-Wallace described the Spitzer discovery as follows:

Reduced to its essentials, the discovery made by Spitzer and his co-inventor Osipow was that finely divided aluminum chlorohydrate could be suspended in an

oil such as isopropyl myristate and that the suspension could be packaged with a propellant in an aerosol container without causing corrosion and without clogging the valve when it is expelled, *provided that the quantity of oil be as great as the quantity of salt* and *that the salt content of the formulation be less than 10%.*

Plaintiff's Trial Brief, at 5–6 (filed February 2, 1981) (emphasis added). A nearly identical statement appears in plaintiff's post-trial submission:

The patentees, Spitzer and Osipow proceeded in a direction contrary to the thinking of experts in the art and presented to Carter-Wallace a formulation including aluminum chlorohydrate, isopropyl myristate and a grease imparting agent. *All of those chemical compounds were known, but the proportions were such that there had to be at least as much of the non-volatile isopropyl myristate as there was salt.*

Plaintiff's Post-Trial Brief, at 2–3 (filed March 20, 1981) (emphasis added). Thus, the only significant difference between the claimed invention and the prior art is a difference in the amounts and relative proportions of the claimed ingredients, i.e., the aluminum chlorohydrate salt, non-volatile oil, and the so-called "grease imparting agent."

In the "typical" case in which a combination patent merely uses known ingredients performing functions described in the prior art, a finding of obviousness and therefore invalidity ordinarily results. *See, e.g., Sakraida*, 425 U.S. at 280–82, 96 S.Ct. at 1536–1538 (1976); *Anderson's-Black Rock*, 396 U.S. at 62–63, 90 S.Ct. at 308–309; *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. at 150–52, 71 S.Ct. at 129–130. An exception to the general rule exists where it is shown that a particular combination achieves a "synergistic" result, that is, an effect greater than the sum of the effects of the individual components taken separately. *See International Telephone*, 538 F.2d at 457 (finding of non-obviousness affirmed where novel combination of known wire insulation

materials was "unexpectedly flame resistant").

In a case like this one, however, in which the claimed invention is not an original combination but rather the location of optimum proportions of known ingredients, the analysis is somewhat more complex. As Walker indicates:

> While a change in the proportions of an old combination may be inventive under some circumstances, it is not so unless the change is critical as compared with the proportions used in the old combination. A change in temperature or in concentration or in both may impart patentability to a process if the particular ranges claimed produce a new and unexpected result which is different in kind and not merely in degree from the results of the prior art. Such ranges are termed "critical ranges" and an applicant has the burden of proving such criticality. However, even though the applicant's modification results in greater improvement and utility over the prior art, it may still not be patentable if the modification was within the capabilities of one skilled in the art. More particularly, where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.

2 Deller's *Walker on Patents* (Second Edition), § 115, at 264.

 Thus, before ruling on the obviousness of the claimed invention, a ruling on the criticality of the numerical limits recited in the patent is required. Although related to and ordinarily subsumed within a discussion of obviousness, as we have done in this case, the issue of criticality is analytically distinct. *California Research Corporation v. Ladd*, 356 F.2d 813, 820 (D.C.Cir. 1965). Whereas the inquiry into obviousness focuses primarily on the manner in which the claimed invention was made and asks whether the results, though perhaps novel and beneficial, were suggested by what had gone before, criticality looks at the claimed invention itself and results achieved, and asks whether they are in fact

sufficiently different from the prior art to justify a grant of the patent monopoly.

The Second Circuit, in *Helene Curtis Industries, Inc., et al. v. Sales Affiliates, Inc., et al*, 233 F.2d 148, 152 (2d Cir.), *cert. denied*, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956), described the purpose which the inquiry into criticality is designed to serve in this type of case as follows:

> The term 'criticality' as used in the patent sense . . . is a device for determining the presence or absence of invention. The question always is whether the inventive act is of sufficient magnitude to justify the extension of a legal monopoly for the matter covered by the claims. And in determining whether a patentable invention is present, certain rules have been formulated, among which is that of criticality.

The test generally used in determining whether the numerical limits of a patent are in fact critical has been summarized as follows:

> [T]he mere location of the optimum conditions of use for a known composition of matter does not constitute 'invention' so as to entitle the discoverer thereof to a monopoly. That objective, however useful the final result, can be achieved by 'patient experiment;' no inventive genius is necessary. Rather, it is only where, other requisites being present, the patentee has found a point or points at which some result differing in kind—and not merely in degree—from the results achieved by the prior art, that an inventive act may be said to exist.

or, stated somewhat differently,

> A patentee may not arbitrarily select a point in a progressive change and maintain a patent monopoly for all operations in that progressive change falling on one particular side of that arbitrarily selected point. It is only where the selected point corresponds with the physical phenomenon and the patentee has discovered the point at which that physical phenomenon occurs that the maintenance of a patent monopoly is admissible.

*Id.* (citing *Kwik Set, Inc. v. Welch Grape Juice Co.,* 86 F.2d 945, 947 (2d Cir. 1936)). *See also Dow Chemical Co.,* 324 U.S. at 328, 65 S.Ct. at 650.

■ In this case, the record is devoid of any evidence from which we might conclude that the numerical limits claimed in the patent in suit are critical. The inventors, Spitzer and Osipow, were uncertain as to how those numerical limits were arrived at. They both indicated that the properties important to commercial success, such as the relative wetness or oiliness of the spray, changed gradually with changes in the relative proportions of powder and oil in test formulations. No test data were introduced in evidence suggesting that the numerical limits of ingredients specified in the patent were anything more than arbitrarily selected points in a progressive change. Concededly, formulations prepared in accordance with those numerical limits demonstrated anti-perspirant efficacy greater than the earlier powder formulations. However, as the Examiner stated in rejecting the claims of the patent, this appears to be nothing more than a difference in *degree*, rather than in *kind*, from the prior art formulations such as those used in CALM and described in the *Specialties* article.[28]

■ Plaintiff asserts that proof of criticality is not necessary in this case, because Spitzer and Osipow discovered a wholly new range, rather than merely selecting optimum points in a known range. In other words, the fact that the Spitzer formulation produces a *wet* spray rather than a *dry* powder one, plaintiff claims, constitutes a sufficient difference in kind from the prior art to sustain the validity of the claimed invention. However, this argument is simply not supported by the evidence. The inventors conceded that the relative wetness or oiliness of the end product changed gradually as they increased the amount of oil in their test formulations. Indeed, Osipow conceded that the very characterization of a particular formulation as "wet" or "dry" was a matter of subjective judgment in close cases.

■ Similarly, plaintiff claims that the criticality doctrine is inapplicable here because the inventors discovered a "new" and "surprising" phenomenon; that encasing the astringent salt in water-repelling oil renders the salt an effective anti-perspirant. However, there was absolutely no evidence that the increased concentration of oil in the Spitzer formulation in any way enhanced the anti-perspirant *properties* of the astringent powder. On the contrary, what evidence there was on this point indicates that the oil in the Spitzer formulation merely performed its known functions, i.e., it helped suspend the aluminum particles inside the can; lubricated the valve; and increased adherence of the astringent particles to the skin. The fact that the use of large quantities of oil proved to be consistent with anti-perspirant efficacy suggests nothing more than that the astringent particles, in order to be effective *at all*, must adhere to and remain on the skin in sufficient quantities; and that, at least to some degree, the benefits resulting from increased adherence outweigh the inhibiting effects that large amounts of oil tend to have on anti-perspirant effectiveness.

■ Plaintiff's repeated characterization of the Spitzer formulation and its results as "new," "unexpected," "surprising," etc., are not sufficient to justify the grant of a patent monopoly where proof of criticality was required. Since plaintiff failed to prove that the numerical limits in Claims 1, 2 and 5 of the patent correspond with any particular physical phenomenon, we conclude that there was not adequate proof of invention to sustain the validity of these

28. Nor can Carter-Wallace claim that it was unaware that the issue of criticality was in dispute in this case. Both defendant's pre and post trial briefs clearly point out that its claim of invalidity is premised in large part upon the lack of criticality. Indeed, lack of criticality was cited by the Examiner as one of the grounds for his rejection of the patent in suit. *Compare California Research Corp.,* 356 F.2d at 820–22 (where applicant only learned after trial that criticality was disputed, remand was appropriate to give the applicant an opportunity to present evidence on the issue).

claims. *Accord Helene Curtis Industries; Application of Aller*, 220 F.2d 454, 42 CCPA 824 (1955); *Gross v. General Motors*, 390 F.Supp. 236 (D.Mass.1975); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648 (D.S. C.1977); *aff'd in pertinent part*, 594 F.2d 979 (4th Cir. 1979) (*per curiam*); *Borden, Inc. v. Occidental Petroleum Corporation*, 381 F.Supp. 1178 (S.D.Tex.1974). *Compare Scandiamant Aktiebolag v. Commissioner of Patents*, 509 F.2d 463, 470–71 (D.C.Cir. 1974) (numerous test results introduced in evidence by applicant led court to conclude that criticality had been demonstrated); and *Application of Waymouth*, 499 F.2d 1273, 1276 (C.C.P.A.1974) (reversing Patent Office rejection of patent where test data clearly showed that use of claimed ratio produced result different in kind from prior art).

■ Returning to the question of obviousness, we conclude that, even if plaintiff had sustained its burden of proving criticality, Claims 1, 2, and 5 would fail on this ground as well, for three reasons. First, as the evidence clearly demonstrates, the claimed invention was not the result of any act of inventive genius, but rather resulted from routine experimentation. While, concededly, simplicity does not negate non-obviousness, *American Safety Table Co. v. Schreiber*, 269 F.2d 255, 263 (2d Cir. 1959), and "serendipity" is consistent with patentability, *California Research Corp.*, 356 F.2d at 817, it is well settled that no invention is involved in discovering optimum ranges of a combination by routine experimentation. *Application of Aller*, 220 F.2d at 458; *Duplan Corp.*, 444 F.Supp. at 741.

In this case, a person of ordinary skill in the industry might well have examined the powder formulations of the prior art and concluded that they were ineffective largely because the astringent powder failed to adhere to the skin in sufficient amounts to achieve significant sweat reduction. He would have known that the use of increased quantities of oil would increase adherence and thereby enhance anti-perspirant efficacy. Of course, he would have also been aware that excessive quantities of oil would prevent water from activating the astringent thereby reducing anti-perspirant efficacy, and produce an overly wet or oily spray. However, routine experimentation would have eventually disclosed to the person of ordinary skill a combination of oil and powder which maximized adherence without adversely affecting efficacy or causing undue oiliness.

Indeed, the above scenario appears to be precisely what occurred in this instance. The fact that the optimum combination of oil and powder, once discovered, proved even more effective than had been expected, is not enough without more to preclude a finding of non-obviousness. Nor does the fact that the particular series of experiments which led to the claimed invention appeared impractical at the time require such a finding. *Aller*, 220 F.2d at 458–59.

Second, our conclusion that the invention was obvious is supported by the fact that the ranges of ingredients recited in Claims 1, 2 and 5 of the patent in suit overlap those disclosed in the prior art. Claim 1 calls for the use of .2 to 10 percent powder and 2 to 50 percent oil. Claim 2 narrows the permissible range to .5 to 5 percent powder and 5 to 25 percent oil. However, as indicated above, Thiel contemplated the use of powder in amounts ranging from .01 to 20 percent, and oil from .1 to 20 percent. Similarly, Goldberg teaches that the powder concentration can range from 4 to 10 percent, and the amount of oil from 2 to 5 percent. Concededly, neither patent specifically requires that the amount of oil be equal to or greater than the amount of powder, a requirement implicit in the claims of the patent in suit. However, this was not necessary; by introducing sufficient evidence of overlapping proportions, defendant satisfied its burden of establishing a prima facie case of obviousness. The burden was then on the plaintiff to adduce evidence (in the form of direct or indirect comparative test results) that use of the claimed ratios pro-

duced unexpected properties not attainable through the practice of the prior art. *Compare Application of Boesch*, 617 F.2d 272, 275–78 (C.C.P.A.1980) (test results failed to rebut prima facie case of obviousness established by overlapping compositional limits); *with Application of Waymouth*, 499 F.2d at 1276 (applicant's test results demonstrated the necessary unexpected results to rebut the prima facie case). In this case, apart from general industry data comparing the efficacy of ARRID and other commercially developed formulations, no such evidence was introduced. Therefore we conclude that plaintiff failed to rebut the prima facie case of obviousness.

Finally, and perhaps most significantly, apart from the specific numerical limits and ratios claimed therein, the very "essence" of the patent in suit, that is, the use of large quantities of oil as the primary suspending medium in an aerosol anti-perspirant, was disclosed in the Yakubik and DeGiacomo articles. Both references teach that the use of unspecified, but significant, amounts of oil increases adherence of the active ingredient to the skin. We agree in this respect with the conclusion of the British Examiner who, in invalidating the British equivalent of the patent in suit, stated:

> In the case of the Yakubik article ... the only mental process required of the skilled man in order to arrive at the applicants' invention appears to be the realisation [sic] that the teaching of the article could be applied to anti-perspirants.

Defendant's Ex. 20–1, at 8. While neither Yakubik nor DeGiacomo expressly mention anti-perspirants, repeated references to application *to the skin* make it clear that anti-perspirant applications were contemplated. In any event, regardless of whether the authors considered applying their teachings to the aerosol anti-perspirant problem, we are persuaded that doing so would have been obvious to a person of ordinary skill in the anti-perspirant industry.

In sum, the record indicates not only that the numerical limits of powder and oil spec-ified in the patent in suit lacked criticality *in fact,* in that they did not produce a result different in kind from the prior art; but that the subject matter of the claimed invention as a whole would have been obvious to a person of ordinary skill in light of the teachings of the prior art.

*Secondary Factors*

Finally, plaintiff urges us to conclude that a finding of nonobviousness is required in this case because of the following "secondary considerations:" (1) the prior failures of the industry to develop a commercially acceptable aerosol anti-perspirant; (2) the fact that the claimed invention was initially viewed with skepticism but eventually hailed as a significant achievement and widely copied; (3) the fact that ARRID satisfied a long-felt consumer need; and (4) evidence of the tremendous commercial success of ARRID.

The Supreme Court has held that secondary considerations such as commercial success, long felt but unresolved needs, failure of others, etc., may indeed be relevant indicia of obviousness or nonobviousness. *Graham*, 383 U.S. at 17–18, 35–36, 86 S.Ct. at 693–694, 702–703. At best, however, evidence of secondary considerations is of limited importance. *Potter Instrument Co., Inc. v. Odec Computer Systems, Inc.*, 499 F.2d 209, 211 (1st Cir. 1974); *Ripple Sole Corporation v. American Biltrite Rubber Co.*, 316 F.2d 54, 55 (1st Cir.), *cert. denied*, 375 U.S. 827, 84 S.Ct. 69, 11 L.Ed.2d 59 (1963). Indeed, the First Circuit has indicated that such evidence is irrelevant except in close cases. *United Shoe Machinery Corp. v. Industrial Shoe Machinery Corp.*, 335 F.2d 577, 578 n.1 (1st Cir. 1964), *cert. denied*, 379 U.S. 990, 85 S.Ct. 702, 73 L.Ed.2d 610, *reh. denied*, 380 U.S. 927, 85 S.Ct. 886, 13 L.Ed.2d 815 (1965).

 Regardless of its potential relevance to the question of *obviousness*, evidence of secondary factors can never substitute for *invention. Graham*, 383 U.S. at 36, 86 S.Ct. at 703; *A. & P. Tea Co.*, 340 U.S. at

153, 71 S.Ct. at 130; *Dow Chemical Co.*, 324 U.S. at 330, 65 S.Ct. at 651. In this case, since the claimed invention lacks the requisite degree of invention, no amount of evidence of commercial success or any of the other secondary factors would suffice to sustain the validity of the patent in suit.

■ In any event, we regard the evidence bearing upon the secondary factors in this case as equivocal at best. For example, Carter-Wallace introduced substantial evidence of the commercial success of its ARRID products. There was testimony that an aerosol anti-perspirant could never achieve and sustain such success unless it were effective. CALM was referred to as a classic example of an underarm product which failed to achieve commercial success because it was ineffective. All this evidence was presumably offered to establish a causal link between the features of ARRID (and therefore of the claimed invention) and its commercial success.

To rebut plaintiff's showing, Gillette introduced evidence indicating that ARRID was supported by a massive promotional and advertising campaign, the largest of any new underarm product in the past twenty years. Even more significantly, Gillette established that years after the introduction of the first ARRID aerosol product, plaintiff developed and marketed a dry powder formulation, similar to CALM and less effective than the original ARRID, and that it too enjoyed significant commercial success. In view of the conflicting evidence, all of which appears credible, we are unable to conclude that the commercial success of ARRID was due solely, or even primarily, to the features of the claimed invention. *See Avant, Inc. v. Polaroid Corp.*, 572 F.2d 889, 891 (1st Cir.), *cert. denied*, 439 U.S. 837, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978) (evidence of commercial success must be linked to the features of the invention to be considered).

Similarly, the fact that ARRID satisfied a long felt consumer need is entitled to little, if any, weight in this case. This is because several of the most pertinent prior art references, including Shulton, Yakubik, and the *Specialties* article, appeared in 1964 and early 1965, only months before the filing of the parent application covering the patent in suit. There is some merit to Gillette's argument that these references rendered largely irrelevant prior unsuccessful efforts to develop a commercially acceptable aerosol anti-perspirant. *See Graham*, 383 U.S. at 36, 86 S.Ct. at 703. Without considering all of the evidence bearing on each of the remaining secondary factors in detail, we reach the same conclusion with respect to industry skepticism, wide-spread copying, and Gillette's improvement patents.

### Infringement

Having ruled that Claims 1, 2 and 5 of the patent in suit are invalid for obviousness and lack of criticality, a ruling on infringement is not strictly necessary for the resolution of this case. *See 7 Walker on Patents*, § 588 at 425 (an invalid patent cannot be infringed). However, the First Circuit has indicated that it is sometimes preferable for a trial court to pass on infringement as well as validity in order to enable an appellate court to determine the action finally. *United Shoe Machinery Corporation v. Industrial Shoe Machinery Corporation*, 335 F.2d at 578.

If the patent in suit were valid, it would be so only because the numerical limits of the claimed ingredients and their relative proportions were critical. In other words, the invention that would sustain validity, had it been present in this case, would have been the discovery that a combination of very specific ingredients in precise amounts produced an aerosol anti-perspirant sufficiently different from the prior art to justify the grant of a limited patent monopoly. Since we ultimately found, among other things, that the requisite criticality had not been shown, we have concluded that the patent is invalid. Had criticality been proven, however, it would be tempting to con-

clude that the slightest change of ingredients by the defendant in its composition might be sufficient to avoid liability for infringement. This is because of the elementary principle that the scope of the patent monopoly can be no greater than that of the invention.

However, such a conclusion is much too facile a solution for what is a somewhat more complex problem. If patent protection were always narrowly limited to the four corners of the claims and specifications, competitors would be free to substitute equivalent ingredients which do little or nothing to alter the function or properties of a patented composition, and would literally, as plaintiff asserts, "laugh all the way to the bank." Such a result would encourage piracy, discourage invention, and ultimately result in the demise of the patent system.

■■■ Fortunately, the law does not require such a result. While it is true that the scope of a patent is limited by its claims, nevertheless:

> Where, . . . an infringer has attempted to appropriate the essence of the invention while remaining outside the language of the claims, courts have not hesitated to apply the doctrine of equivalents whereby the "essence" of the invention is protected.

4 *Walker on Patents*, § 241 at 112. *See also Foster Metal Products v. Jacoby-Bender, Inc.*, 255 F.2d 869, 875–76 (1st Cir. 1958) (substitution for, or addition to previous combination does not necessarily escape infringement charge even when it brings about some improvement in function); *St. Regis Paper Company v. Winchester Carton Corporation*, 410 F.Supp. 1304, 1308–09 (D.Mass.1975) (nor can infringement charge be avoided where a competitor, by substitution or addition, accepts a somewhat less desirable result while acting within the concept of the invention); 7 *Walker on Patents*, § 564 at 381–82 (doctrine of equivalents has the same application to infringe-

ment of a combination patent as to any other invention). The theory on which the doctrine of equivalents is based is that if two compositions or ingredients achieve the same result in substantially the same way, they are considered by the law to be the same, even though they are different in name, form, or shape. *Walker*, § 546 at 336.

■■■ Our review of the record in light of the above principles of law persuades us that if Claims 1, 2 and 5 of the patent in suit were valid, defendant's challenged compositions would infringe. Defendant's aerosol anti-perspirant formulations numbered 1, 4–8, 11, 12, 14–17, 19, 20 and 21 in Plaintiff's Ex. 98A fall within the limits of Claims 1 and 5 of the patent in suit. Defendant's formulations numbered 1, 4–8, 11 and 12 also fall within the limits of Claim 2 of the patent. Each of Gillette's accused formulations contain all of the recited ingredients, or their substantial equivalents, in all of the required ratios set forth in the claims; each operates substantially as contemplated by the patent; and each achieves substantially the same result as is taught therein.

■■■ Our review of the record further persuades us that the doctrine of file wrapper estoppel is not applicable in this case. This doctrine provides that, where a party narrows his claim in order to obtain allowance by distinguishing it from a prior patent cited by the Patent Office, he cannot later broaden it in an infringement action to make it equal in scope with the prior patent. 4 *Walker on Patents*, § 234. Gillette claims that by excluding alcohol from the claims of the patent in suit, Carter-Wallace "narrowed" its claims and cannot now "broaden" them to cover Gillette's formulations which contain a small amount of alcohol.

Nothing in the claims, specification, or file history of the patent in suit, however, indicates that a small amount of alcohol added to the Spitzer composition takes that

composition outside of the claimed invention. As indicated above, the patent does teach away from the use of alcohol. The reference however, is to the use of alcohol as the primary suspending medium instead of a non-volatile oil. Those of defendant's accused formulations which contain small quantities of alcohol achieve the same result as taught in the patent in the same way. The alcohol is added solely to aid the action of the suspending agent, a component not required as an essential element of the invention. The alcohol is not used instead of the non-volatile liquid component and does not render the composition alcohol-based. Thus, defendant's formulations containing small amounts of specially denatured alcohol would also infringe the patent in suit if it were valid.[29]

### Attorney's Fees

■ 35 U.S.C. § 285 provides that the court may award attorney's fees to the prevailing party in "exceptional cases." Defendant cites numerous cases in support of its contention that plaintiff's failure to highlight pertinent prior art before the Patent Office is sufficient, without more, to convert this action into an exceptional case. See Defendant's Proposed Findings of Fact and Conclusions of Law, at 55–57 (filed February 26, 1981). The significance of plaintiff's failure in this regard has been discussed above and need not be repeated here. We view any failure on the part of the plaintiff to cite pertinent prior art in this instance as insufficient to convert this into an exceptional case and deny Gillette's request for attorney's fees. See generally, 8 Walker on Patents, § 760 (award of attorney's fees appropriate where the losing party has acted in bad faith or where otherwise necessary to prevent injustice).

### CONCLUSION

■ The patent in suit fails on the grounds of a lack of demonstrated criticality and obviousness.

The numerical limits relied upon to distinguish the prior art were not shown to be sufficiently critical to sustain the patent.

The claimed invention was obvious in view of the combined disclosures and teachings of the pertinent prior art to a person of ordinary skill in the art.

Accordingly, the plaintiff's claim for infringement is dismissed. Judgment shall be entered in favor of the defendant on its counterclaim declaring that Claims 1, 2, and 5 of the patent in suit are invalid.

---

**29.** Gillette claims Carter-Wallace at one point changed the word "comprising" in the claims to "consisting essentially of" in order to take advantage of the legal meaning of the latter phrase to indicate that alcohol was expressly excluded from the invention. The phrase "consisting essentially of" is a term of art used in chemical patent practice which has an accepted meaning. Its use leaves the claim open for the inclusion of unspecified ingredients which do not materially affect the basic and novel characteristics of the composition. Application of Janakirama-Rao, 317 F.2d 951, 952, 50 CCPA 1312 (1963). Accordingly, defendant's argument with respect to the use of alcohol draws no additional support from the plaintiff's use of this phrase.

APPENDIX "A"

United States Patent [19]

Spitzer et al.

[11] 3,968,203

[45] July 6, 1976

[54] AEROSOL ASTRINGENT COMPOSITION

[75] Inventors: Joseph G. Spitzer, Mamaroneck; Lloyd Osipow, New York, both of N.Y.

[73] Assignees: Jerome G. Spitzer, Mamaroneck; Marvin Small, New York, both of N.Y.; part interest to each

[22] Filed: Aug. 26, 1969

[21] Appl. No.: 853,626

Related U.S. Application Data

[63] Continuation of Ser. No. 492,268, Oct. 1, 1965, abandoned.

[52] U.S. Cl. ........................ 424/47
[51] Int. Cl.$^2$ .................... A61K 7/38
[58] Field of Search .............. 424/68, 47

[56] References Cited
UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 3,014,844 | 12/1961 | Thiel et al. ............. | 424/45 |
| 3,081,223 | 3/1963 | Gunning et al. ........ | 424/68 X |
| 3,088,874 | 5/1963 | Geary et al. ...... | 424;167/45;82 |
| 3,088,874 | 5/1963 | Geary et al. ............ | 167/82 |
| 3,095,355 | 6/1963 | Abramson et al. ........ | 424/45 |
| 3,218,263 | 11/1965 | Boyle et al. .......... | 424/45 X |
| 3,288,681 | 11/1966 | Goldberg et al. ....... | 424/68 X |
| 3,472,928 | 10/1969 | Nirzi .............. | 424/68 X |

FOREIGN PATENTS OR APPLICATIONS

| | | | |
|---|---|---|---|
| 941,692 | 11/1963 | United Kingdom ........ | 424/68 |
| 987,301 | 3/1965 | United Kingdom ........ | 424/68 |
| 1,111,867 | 5/1968 | United Kingdom ....... | 424/68 |
| 1,167,173 | 10/1969 | United Kingdom ........ | 424/68 |

OTHER PUBLICATIONS

Sagarin, Cosmetics Science and Technology, 9/1957, pp. 717–732, 819–829.
Shepherd, Aerosols, Science and Technology, 1963, pp. 47–79 and 347–351.
Aerosol Age, 4/1964, p. 42.
Aerosol Age, 4/1962, pp. 64 and 67.
Beard, Drug and Cosmetic Industry, 1/1955, vol. 76, No. 1, pp. 49 and 50.
Husted, Paper Presented at 46th Mid-Year Meeting of Chemical Specialties Manufacturers Assoc., Inc., Chicago, 8/1960.
Geary et al., Paper Presented at 47th Mid–Year Meeting of Chemical Specialties Manufacturers Assoc., 6/1961, pp. 80 to 82, & 91.
Aerosol Age, 8/1958, p. 37.
Soap and Chemical Specialties, 10/1964, pp. 105–107.
Aerosol Age, 6/1961, pp. 37, 83 and 84.
Drug & Cosmetic Industry, 12/1965.
Aerosol Age, 8/1961, pp. 22, 26–29, 71 and 72.
Aerosol Age, 4/1957, pp. 24 and 65.
The Toilet Goods Assoc., No. 37, 5/1962, pp. 19–26.
Soap and Chemical Specialties, 5/1956, pp. 164 and 165.
"Freon" Aerosol Report, 1956, pp. 1 to 11.
"Freon" Aerosol Report, 1969, pp. 1 to 6, and Appendix pp. 1 to 3.
Drug and Cosmetic Industry, 11/1966.
The Pharmaceutical Journal, 10/1964, pp. 390–395.
Soap and Chemical Specialties, 4/1959, pp. 69–73.
Drug and Cosmetic Industry, vol. 79, No. 3, pp. 328–329, 8/1956.
American Perfumes and Aromatics, vol. 75, No. 10, 10/1960, pp. 47 and 48.
Soap & Chemical Specialties, 6/1961, pp. 81–83 and 91.

Primary Examiner—Dale R. Ore
Attorney, Agent, or Firm—George B. Finnegan; John D. Foley

[57] ABSTRACT

This invention relates to a novel astringent antiperspirant aerosol system which comprises an astringent salt suspended in fine powder form in an anhydrous liquid vehicle and a propellant.

5 Claims, No Drawings

3,968,203

1

2

## AEROSOL ASTRINGENT COMPOSITION

This is a continuation of Application Serial No. 492,268, filed Oct. 1, 1965, now abandoned.

This invention relates to a novel astringent and anti-perspirant aerosol system. More particularly, this invention relates to a novel astringent and anti-perspirant formulation which enables a liquid spray of an astringent to be dispensed in a conventional aerosol bomb. The aerosol astringent and anti-perspirant formulation of this invention consists essentially of an astringent material in a fine powder form suspended in a liquid vehicle which is essentially anhydrous; the liquid vehicle being of such nature that upon release of the contents from the container, the powder astringent is deposited on the skin in the form of a liquid suspension of the astringent powder.

Prior to the instant invention, there has not been available a truly commercially acceptable aerosol anti-perspirant and deodorant composition that could be packaged in a conventional metal aerosol bomb. In order to provide effective anti-perspirant activity, it is essential that there be present an astringent material. Water-soluble aluminum salts such as aluminum sulfate containing water of crystallization, aluminum chloride and aluminum chlorohydrate, which have attained increasing importance in the United States, have proved to be most effective anti-perspirants.

The above mentioned astringents and anti-perspirants are effective when present in aqueous solution. Hence, heretofore, it has generally been the practice in formulating anti-perspirant preparations employing such aluminum salts (e.g. creams, lotions, etc.) to include therein a sufficient amount of water to carry the required concentration of antiperspirant in solution.

Unfortunately, water-containing aerosol anti-perspirant formulations cause major problems when contained in conventional metal aerosol bombs. One of the major problems is corrosion caused by the corrosive action of the aluminum salt in solution. Another problem has been that the use of an effective concentration also tends to cause valve malfunction due to the crystallization of the salts in the valve orifice.

Attempts have been made to solve the above mentioned problems resulting from the use of aqueous solutions of aluminum salts by incorporating the aluminum salt in an aerosol package in such a manner that it is expelled and applied in the form of a powder. In practice this has not been satisfactory. Clouds of dust are expelled and because of the proximity of the underarm to the face, volumes of astringent aluminum salt are breathed by the user.

Objects and advantages of the invention are set forth in part herein and in part will be obvious herefrom, or may be learned by practice with the invention the same being realized and attained by means of the compositions, steps, methods and combinations pointed out in the appended claims.

The invention consists in the compositions, steps, methods, combinations and improvements herein shown and described.

An object of this invention is to provide improved aerosol astringent formulations which when contained in conventional metallic aerosol containers cause minimum or negligible internal container difficulties, and in particular, improved results with respect to corrosion and/or valve malfunction.

A further object of this invention is to provide an improved aerosol astringent composition which, when dispensed from a suitable container, is applied to the skin as a wet spray in the form of a liquid suspension of astringent material, said astringent material being activated to effect anti-perspirant activity by the moisture of the air and the body.

A further object of this invention is to provide an improved astringent preparation which may be applied to the skin as a wet spray of astringent which imparts thereto a feeling of lubrication and also reduces the likelihood of breathing the astringent as would be the case when a dry powder or dust of astringent material is dispensed from a container and applied to the skin.

Another object of this invention is to provide an improved astringent preparation in aerosol form which minimizes valve malfunction such as clogging and leakage.

It has been found that the objects of this invention may be realized by providing an aerosol astringent composition comprising an astringent material in fine powder form suspended in a liquid vehicle which is essentially anhydrous, the liquid vehicle containing as essential components a liquified propellant and a non-volatile, non-hygroscopic liquid. When stored in a suitable aerosol container, the astringent material is in an inactive state because of the essentially anhydrous environment rather than in a water-solution active form. Hence, because of the inactive nature of the astringent while in the container the problem of corrosion caused by the corrosive action of the astringent when in its active state is avoided. Upon release from the container, however, the astringent is applied to the skin, as a wet spray, in the form of a liquid suspension of fine powder astringent, the astringent material exhibiting astringent and anti-perspirant properties when converted to its active form by the moisture in the air and on the body.

As indicated hereinbefore, an essential component of the liquid vehicle of the aerosol formulation of this invention is a non-volatile, non-hygroscopic liquid. Such non-volatile, non-hygroscopic liquid component serves to maintain the expelled and deposited astringent powder as a liquid, relatively dust-free spray.

Depositing the astringent on the skin in the form of a liquid spray containing the astringent powder dispensed in a non-volatile liquid affords many advantages. First of all, since a liquid rather than a dry powder is applied to the skin, the skin feels lubricated and does not feel dry and harsh, as would be the case if a powder was deposited on the skin.

Secondly, since the liquid component of the wet spray is non-volatile, the spray effectively adheres to the skin so that the astringent when in its active form can exert effective anti-perspirant activity over a desired long period of time.

Thirdly, if a non-volatile liquid were not part of the liquid vehicle for the astringent powder of the aerosol formulation, the resulting product when dispensed from the container would be a fine dust which would settle very slowly. When sprayed under the arms, it would be quite difficult to avoid breathing the dust, with the result that the astringent would enter the lungs. When the liquid vehicle contains a non-volatile liquid, as is the case in the instant invention, the droplets of the resulting spray are relatively large and settle rapidly. Consequently, the likelihood of breathing the astringent is very much reduced.

3,968,203

A further advantage in the use of a non-volatile non-hygroscopic liquid as a component of our aerosol formulation, is that it, in combination with the other liquefied components, maintains the anti-perspirant aluminum salts in an insoluble, non-ionizing condition, as a consequence of which the salts are non-corrosive to metals.

From the above discussion, it becomes readily apparent that if one is to realize the desired objectives, a non-volatile, non-hygroscopic liquid must be included as an essential component for mixture with the liquefied propellant in providing the desired liquid vehicle for the astringent powder. The use of a volatile component, e.g. alcohol, instead of a non-volatile component would not give suitable results. First, since alcohol is of a volatile nature, it would evaporate fairly quickly to leave a powder deposited on the skin, the disadvantages of which having been discussed hereinbefore in detail. Second, it would be much more difficult to compound with alcohol and keep it anhydrous than with a non-volatile, non-hygroscopic liquid used in accordance with the instant invention. Even if only a small amount of water were introduced, as would be quite probable if alcohol were employed, corrosion would result. Third, by using a volatile liquid, such as alcohol, a small residue remains on the actuator. The liquid evaporates leaving a powdered dry aluminum salt on the actuator. This picks up moisture from the atmosphere which dissolves the aluminum salt, if some moisture evaporates or the temperature drops, large crystals form which clog the actuator. These problems are avoided by the use of a non-volatile, non-hygroscopic liquid.

The principles of this invention are applicable to any astringent material which, in dry powder form is in an inactive state, but, which, in the presence of moisture, is converted to an active state. Examples of astringents of the aforementioned type are the astringent salts of multi-valent cations such, for example, as the divalent astringent salts exemplified by zinc chloride, zinc sulfate and zinc sulfocarbolate, the trivalent astringent salts such as aluminum sulfate, aluminum chloride, aluminum sulfocarbolate, aluminum chlorohydrate, ferric chloride; and tetra valent astringent salts such as zirconium tetrachloride, zirconium sulfate. The preferred anti-perspirant agent of this invention are the above mentioned astringent aluminum salts.

Suitable non-volatile, non-hygroscopic liquid for use in combining with the liquified propellant in providing the desired liquid vehicle are essentially non-polar organic liquids having: (a) a vapor pressure less than about 25 mm of mercury at 70°F; (b) a boiling point at atmospheric pressure not lower than 250°F; (c) a dielectric constant not greater than 10, and preferably less than 5; (d) a specific gravity between 0.7 and 1.6 and preferably between 0.7 and 1.2; and (e) a water insolubility such that it will not dissolve more than about 5% of water at 70°F. Examples of such materials are hydrophilic oils such as hydrocarbon oils exemplified by tetradecane; organic esters such as isopropyl myristate and glyceryl trioleate; alcohols such as lauryl alcohol; carboxylic acids such as oleic acid; and, silicone oils such as the dimethylpolysiloxanes.

Any conventional propellant, or mixture of propellants may be used that has the desired vapor pressure at atmospheric temperature to effect dispensing of the contents of the container but which pressure is not unduly excessive so as to cause excessive dusting when the astringent formulation is sprayed against the skin. Generally, the vapor pressure is in the range of 15 to 75 p.s.i.g. at 70°F, and preferably 20 to 50 p.s.i.g. Examples of materials that may be used as a propellant component, either alone or in admixture, are trichlorofluoromethane (Freon 11), dichlorodifluoromethane (Freon 12), tetrafluorodichloroethane (Freon 114), pentafluoromonochloroethane (Freon 115), cyclic hexafluorodichlorobutane (Freon C 316), octafluoropropane (Freon 218), cyclic octafluorobutane (Freon C 318), propane, butane, pentane and isobutane.

Also, the propellant should not react with the astringent material or the non-volatile, non-hygroscopic liquid or any other constituent of the aerosol formulation to create difficulties while the aerosol formulation is contained in the can or deleteriously affect their desired activities when applied to the skin.

The astringent should be in an amount sufficient to impart the desired anti-perspirant activity when activated by the moisture in the air but should not be in too great an amount to cause excessive dusting when sprayed against the skin. In general, the astringent is in an amount from .2 to 10% and preferably .5 to 5% by weight of the total composition, and in an amount from .01 to 1.0 part by weight and preferably .05 to .3 part per part of the non-volatile, non-hygroscopic liquid. Also, the astringent should have a particle size sufficiently small to minimize valve malfunction. In general, the astringent powder has a particle size in the range of 1 to 100 microns, and preferably less than 50 microns.

The non-hygroscopic liquid should be in an amount sufficient whereby the astringent is deposited on the skin in the form of a wet spray but should not be in too high an amount wherein it would interfere with the anti-perspirant action of the astringent as well as causing the wet spray deposited on the skin to be of too oily a nature. In general, the non-volatile, non-hygroscopic liquid is in an amount from 2 to 50% by weight of the total composition, preferably 5 to 25% by weight.

As indicated hereinbefore, the propellant should be in an amount to provide the desired vapor pressure for dispensing the desired contents from the container without causing excessive dusting when the wet spray containing the dispensed astringent is applied against the skin. In general, the propellant is in an amount from 50 to 98% by weight of the total composition, preferably 75 to 95% by weight.

It has been found desirable to incorporate in the aerosol compositions of this invention certain materials which have grease-like imparting properties to the non-volatile, non-hygroscopic liquid and greatly aid in preventing malfunction of the aerosol valve. These materials are characterized by the fact that they prevent compacting of the anti-perspirant powder in the completed composition and they also act as thickening or jelling agents for the non-volatile, non-hygroscopic liquid. Examples of such materials are hydrophobic treated clays that swell in organic solvents, e.g. hydrophobic bentonite, e.g. Bentone 34, a reaction product of bentonite and dimethyl distearyl ammonium chloride, the latter constituting one third of the Bentone compound; colloidal silicas, e.g. Cab-O-Sil M-5, a submicroscopic particulate silica prepared in a hot gas environment (1100°C) by the vapor phase hydrolysis of a silicon compound; grease forming soaps such as aluminum stearate. Agents of the aforedescribed type are of colloidal dimensions and in general have a particle size below 5 microns.

3,968,203

5

In general, these agents are in an amount up to 1% by weight of the total composition and preferably 0.05 to 1% by weight.

As is the usual practice for astringent cosmetic compositions, there may be included small amounts of a perfume. In general, the perfume is in an amount up to 2% by weight of the total composition, and preferably 0.05 to 2% by weight.

Also, if so desired, there may be included in our aerosol formulation, a small amount of an anti-bacterial agent, e.g. hexachlorophene, to impart thereto deodorant characteristics. In general, the anti-bacterial agent is in an amount up to 0.5% by weight of the total composition, and preferably 0.02 to 0.2% by weight.

In order to illustrate the invention more specifically, the following working examples are now given:

### Example 1

| | Parts by Weight |
|---|---|
| Aluminum chlorohydrate impalpable powder | 2.0 |
| Hexachlorophene | 0.1 |
| Bentone No. 34 | 0.3 |
| Isopropyl myristate | 6.0 |
| Trifluorotrichloroethane | 12.6 |
| Tetrafluorodichloroethane | 65.0 |
| Difluorodichloromethane | 14.0 |

### Example 2

| | |
|---|---|
| Aluminum chlorohydrate impalpable powder | 3.0 |
| 3,5,4′ Tribromosalicylanilide | 0.1 |
| Cab-O-Sil, M-5 | 0.6 |
| Butyl stearate | 10.0 |
| Tetrafluorodichloroethane | 66.3 |
| Difluorodichloromethane | 20.0 |

### Example 3

| | |
|---|---|
| Aluminum sulfocarbolate (less than 50 microns diameter) | 4.0 |
| Hexachlorophene | 0.2 |
| Cab-O-Sil, M-5 | 0.5 |
| Mineral Oil | 5.0 |
| Hexane | 10.0 |
| Isobutane | 80.3 |

### Example 4

| | |
|---|---|
| Aluminum sulfate (less than 50 microns diameter) | 1.0 |
| 3,5,4′ Tribromosalicylanilide | 0.2 |
| Bentone No. 34 | 0.4 |
| Isopropyl palmitate | 10.0 |
| Fluorotrichloromethane | 63.4 |
| Difluorodichloromethane | 25.0 |

### Example 5

| | |
|---|---|
| Aluminum chlorohydrate impalpable powder | 2.0 |
| Hexachlorophene | 0.2 |
| Bentone No. 34 | 0.3 |
| Oleyl Alcohol | 5.0 |
| Hexane | 10.0 |
| Tetrafluorodichloroethane | 52.5 |
| Difluorodichloromethane | 30.0 |

### Example 6

| | |
|---|---|
| Aluminum chlorohydrate impalpable powder | 2.0 |
| Hexachlorophene | 0.1 |
| Isopropyl myristate | 6.0 |
| Trifluorotrichloroethane | 12.9 |
| Tetrafluorodichloroethane | 65.0 |
| Difluorodichloromethane | 14.0 |

The invention in its broader aspects is not limited to the specific compositions, steps, methods, combinations and improvements described, but departures may be made therefrom within the scope of the accompanying claims without departing from the principles of the invention and without sacrificing its chief advantages.

What is claimed is:

1. A package for containing and dispensing an astringent and anti-perspirant agent including in combination

6

a. a pressure-tight metallic container having a valve-controlled opening and a valve for dispensing liquid in aerosol form, and

b. a composition in said container consisting essentially of

c. an aluminum chlorohydrate astringent in fine powder form of about 1 to 100 microns, said astringent being in an inactive state while dry but being corrosive to the metal of said container and having anti-perspirant properties in the presence of moisture, and

d. an essentially anhydrous liquid vehicle serving to maintain the composition in liquid form and free from moisture while in said container, said astringent powder being suspended and dispersed in said liquid within the container,

e. said liquid vehicle consisting essentially of

1. A liquified propellant which is gaseous at room temperature and atmospheric pressure and non-reactive with the other components present in said package and

2. a non-volatile, non-hygroscopic liquid, said non-hygroscopic liquid being a non-polar, organic liquid having (a) a vapor pressure less than about 24 mm of mercury at 70°F.; (b) a boiling point at atmospheric pressure not lower than 250°F.; (c) a dielectric constant not greater than 10; (d) a specific gravity between 0.7 and 1.6; and (e) a water insolubility such that it will not dissolve more than about 5% of water at 70°F.;

f. said astringent powder and non-volatile, non-hygroscopic liquid being dispensed together from the container in the form of a liquid suspension upon release of the valve and volatilization of the propellant so as to be applied to the skin in the form of a liquid suspension of the astringent powder

g. the astringent being in an amount from 0.2 – 10% by weight of the total composition, the non-volatile, non-hygroscopic liquid being in an amount from 2 to 50% by weight of the total composition and the propellant being in an amount from 50 to 98% by weight of the total composition, the relative amounts of astringent and non-volatile, non-hygroscopic liquid being in an amount from 0.01 to 1 part by weight of astringent per part by weight of the non-volatile, non-hygroscopic liquid such that the product that is applied to the skin is in the form of a liquid suspension of the astringent powder.

2. A package according to claim 1 wherein the astringent is in an amount from 0.5 to 5% by weight of the total composition and the non-volatile, non-hygroscopic liquid is in an amount from 5 to 25% by weight.

3. A package according to claim 1 wherein the astringent is in an amount of 2.0% by weight and the non-volatile, non-hygroscopic liquid is isopropyl myristate in an amount of 6.0% by weight.

4. A package according to claim 1 wherein the astringent is in an amount from 0.05 to 0.3 part by weight per part of the non-volatile, non-hygroscopic liquid.

5. A package according to claim 1 wherein the aerosol astringent and anti-perspirant composition contains an agent having grease-imparting properties with respect to the non-volatile, non-hygroscopic liquid, said grease-imparting agent selected from the group consisting of bentonite, silica and aluminum stearate.